# United States Court of Appeals
## For the First Circuit

No. 02-1899

ATLANTIC FISH SPOTTERS ASSOCIATION, ET AL.,
Plaintiffs, Appellants,

v.

DONALD L. EVANS, AS HE IS SECRETARY OF COMMERCE, ET AL.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

Charles Tiefer, with whom David E. Frulla, Andrew D. Herman,
Brand & Frulla, PC, H. Reed Witherby, and Smith & Duggan, LLP were
on brief, for appellants.
Anton P. Giedt, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, and Caroline Park,
Office of General Counsel, NOAA/NMFS, were on brief, for appellee
Evans.
Jay S. Johnson, with whom Ball Janik, LLP was on brief, for
appellees General Category Tuna Association et al.

February 25, 2003

**SELYA**, **Circuit Judge**.  This appeal requires us to determine whether Congress intended to use an annual appropriations bill as a vehicle for enacting permanent law to abolish the use of "spotter planes" by tuna fishermen.  The district court held that it did and entered judgment accordingly.  Atl. Fish Spotters Ass'n v. Evans, 206 F. Supp. 2d 81 (D. Mass. 2002).  Because the pertinent statutory language does not express Congress's intent to enact permanent law with sufficient clarity to overcome the presumption that a provision in an appropriations bill applies only to the fiscal year for which it is enacted, we reverse.

## I.  BACKGROUND

Inasmuch as the material facts are not in dispute, we present here only those details that are necessary to frame the issue on appeal.  We refer persons who desire the full flavor of the litigation's factual and procedural history to the district court's thorough opinion.  See id. at 84-86 & n.2.

We start our sketch by acknowledging that the love of money is the root of the parties' shared interest in how to harvest Atlantic bluefin tuna.  A single bluefin can sell for more than $50,000.  Those who oppose the use of airborne spotters contend that their deployment gives unfair advantage, and, moreover, shortens the bluefin season because boats using this technique quickly exhaust the allowed harvest.

-2-

Against this backdrop, we identify the protagonists. Plaintiff-appellant Atlantic Fish Spotters Association (AFSA) is a trade association. Its membership is comprised of pilots who are capable of locating schools of fish from the air and guiding fishermen toward them. The pilots offer their services to surface vessel fishermen, many of whom consider this methodology highly efficient. The individual plaintiffs-appellants, Jonathan E. Mayhew, Robert H. Sampson, William C. Chaprales, and Ralph E. Pratt, earn their livelihoods either as spotter pilots or as fishermen who wish to use spotter services in endeavoring to catch bluefin tuna. Defendant-appellee Donald L. Evans is the incumbent Secretary of Commerce (the Secretary). He is responsible for administering programs that fall under the aegis of the United States Department of Commerce. The National Oceanic and Atmospheric Administration (NOAA) is an agency within the Department of Commerce, and the National Marine Fisheries Service (NMFS) is a part of the NOAA. The other appellees, who intervened as defendants below, are the General Category Tuna Association and the Northshore Community Tuna Association (the Intervenors). These groups represent the interests of those who employ traditional methods of fishing for bluefin tuna, unassisted by airborne spotters.

The centerpiece of this litigation is a federal permitting scheme, within the purview of the Department of

Commerce, applicable to the harvesting of bluefin tuna. See Atlantic Tunas Convention Act, 16 U.S.C. §§ 971-971k (2000); Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1883 (2000). According to the Secretary, the law in force from and after the 2001 fishing season required the NMFS to issue most bluefin permits[1] with the condition "that the fishing activities . . . will not involve the use of an aircraft in any manner." The Secretary traces this ban to a rider attached to an appropriations bill for fiscal year (FY) 2001. Because the Secretary reads the rider as creating permanent law that leaves him no discretion, he has issued permits for both the 2001 and 2002 fishing seasons with the disputed condition attached and intends to follow this praxis for the 2003 season.

On June 7, 2001, the AFSA filed a complaint in the United States District Court for the District of Massachusetts seeking, inter alia, declaratory and injunctive relief limiting the permit condition to the 2001 fishing season.[2] The AFSA argued that the appropriations rider only prohibited the use of spotter aircraft in

---

[1]We say "most" because the NMFS divides permits into three categories. The General Category covers a broad variety of fishing methods; the Harpoon Category covers the use of harpoons; and the Dredge Category covers the use of large nets. Only permits in the first two categories are at issue here.

[2]The complaint also charged the Secretary with violating both the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706, and the Regulatory Flexibility Act, id. §§ 601-612. Those claims are not at issue in this appeal.

catching bluefin tuna through FY 2001, and that without additional authorization from Congress, the ban was not enforceable after the end of that fiscal year (September 30, 2001).[3]

After the Intervenors had entered the fray, the parties filed cross-motions for summary judgment. The district court applied common canons of construction to the statutory language and granted summary judgment in favor of the defendants. Atl. Fish, 206 F. Supp. 2d at 95. This timely appeal followed.

## II. ANALYSIS

Summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When the parties cross-move for summary judgment, the district court must resolve all genuine factual disputes in favor of the party opposing each such motion and draw all reasonable inferences derived from the facts in that party's favor. New Engl. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 19 (1st Cir. 2002). We afford de novo review to orders granting summary judgment,

---

[3]Prior to FY 2001, the Secretary attempted to impose a similar condition by regulation. Atl. Fish Spotters Ass'n v. Daley, 8 F. Supp. 2d 113, 115-16 (D. Mass. 1998). The AFSA successfully challenged the Secretary's authority to do so. Id. at 116-18. Thus, the Secretary cannot lawfully impose the disputed condition absent a statute empowering him to do so.

applying essentially the same decisional framework. Id. Such non-deferential review is particularly appropriate in cases, such as this one, that hinge on matters of statutory interpretation. Plumley v. S. Container, Inc., 303 F.3d 364, 369 (1st Cir. 2002).

The question before us concerns the proper interpretation of a rider attached to an appropriations bill. The key provision reads:

> None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce shall be available to issue or renew, for any fishing vessel, any general or harpoon category fishing permit for Atlantic bluefin tuna that would allow the vessel —
>
> (1) to use an aircraft to locate, or otherwise assist in fishing for, catching, or possessing, Atlantic bluefin tuna; or
>
> (2) to fish for, catch, or possess[] Atlantic bluefin tuna located by the use of an aircraft.

Act of Dec. 21, 2000, Pub. L. No. 106-553, app. B § 634, 2000 U.S.C.C.A.N. (114 Stat.) 2762, 2762A-114 (Section 634). The district court held that the language of Section 634 created permanent law. Atl. Fish, 206 F. Supp. 2d at 92. We test this construct.

Statutory interpretation begins — and sometimes ends — with the relevant statutory text. Plumley, 303 F.3d at 369. When the words of a statute neither create ambiguity nor lead to an entirely unreasonable interpretation, an inquiring court need not

consult other aids to statutory construction. United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987). In discerning Congress's intent from the statute itself, we attribute to words that are not specially defined in the text their ordinary usage, albeit with the commonsense understanding that meaning can only be ascribed to language when it is taken in context. Riva v. Commonwealth of Mass., 61 F.3d 1003, 1007 (1st Cir. 1995).

This interpretive modality is particularly apt when the meaning of an annual appropriations bill hangs in the balance. A provision in an annual appropriations bill presumptively applies only during the fiscal year to which the bill pertains. The presumption may be rebutted, however, if the appropriations bill "expressly provides that it is available after the fiscal year covered by the law in which it appears." 31 U.S.C. § 1301(c)(2) (2000).

These principles are deeply rooted in our jurisprudence. Their origins can be traced to the opinion in Minis v. United States, 40 U.S. 423 (1841), in which the Supreme Court wrote that "[i]t would be . . . unusual, to find engrafted upon . . . temporary appropriations, any provision . . . to have . . . permanent application to all future appropriations. Nor ought such an intention on the part of the legislature to be presumed." Id. at 445. In the more than 160 years since Minis was decided, the Court has reiterated, time and time again, that appropriations

bills have no more effect on existing law than that which is manifest in the language of any particular provision. See, e.g., United States v. Will, 449 U.S. 200, 222 (1980); TVA v. Hill, 437 U.S. 153, 190 (1978). The Court has made equally clear that if an appropriations bill changes existing law, any such change applies only to the fiscal year for which the bill was passed unless Congress clearly expresses a contrary intent. See United States v. Vulte, 233 U.S. 509, 514-15 (1914); United States v. Langston, 118 U.S. 389, 394 (1886). Notwithstanding the growing complexity of the appropriations process, see 1 United States General Accounting Office, Principles of Federal Appropriations Law 1-8 to 1-11 (2d ed. 1991) (GAO Principles), available at www.gao.gov, the courts of appeals have continued to abide by these precepts. E.g., Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 146 (2d Cir. 2002); Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin, 961 F.2d 269, 273-74 (D.C. Cir. 1992). The rule, then, is that Congress may create permanent, substantive law through an appropriations bill only if it is clear about its intentions. Put another way, Congress cannot rebut the presumption against permanence by sounding an uncertain trumpet.

In the final analysis, the question of permanence vel non depends on Congress's intent as expressed in the particular appropriations bill. See Will, 449 U.S. at 222; see also Martinez, 277 F.3d at 149-50 (explaining that courts are obliged "to remain faithful to Congress's words expressed in the whole statutory

-8-

scheme"). Thus, the presumption against permanence in appropriation bills can be overcome if Congress clearly expresses its intention to create permanent law or if the nature of the provision would make any other interpretation unreasonable. See Minis, 40 U.S. at 445; see also 62 Comp. Gen. 54, 56 (1982), 1982 WL 26705, at *2; GAO Principles at 2-31 to 2-32.

Although this sets the bar quite high, statutory language that affirmatively defies temporal limitation nonetheless can overcome the presumption. See Martin, 961 F.2d at 274; Cella v. United States, 208 F.2d 783, 790 (7th Cir. 1953); see also GAO Principles at 2-29. Thus, Congress can imbue an appropriations provision with permanence by using "words of futurity." United States v. Int'l Bus. Mach. Corp., 892 F.2d 1006, 1009 (Fed. Cir. 1989). We caution, however, that even the presence of such words will not establish permanence if that construction would render other statutory language meaningless or lead to an absurd result. See Martinez, 277 F.3d at 146 (refusing to read permanence into a provision containing the word "hereafter" when doing so would impliedly repeal another provision in the same bill).

Measured by this yardstick, the appropriations bill upon which the Secretary relies fails to evince a congressional intent to make permanent Section 634's ban on the use of spotter aircraft. For one thing, the text of Section 634 contains no words of futurity (and, thus, the language is impuissant to overcome the

presumption against permanence). See Minis, 40 U.S. at 445; Int'l Bus. Mach., 892 F.2d at 1009. For another thing, the nature of Section 634 is not so foreign to the surrounding appropriations as to make it unreasonable to interpret its text as creating temporary law. See Minis, 40 U.S. at 445; 62 Comp. Gen. at 56-57, 1982 WL 26705, at *3; GAO Principles at 2-31 to 2-32.

Nor do we consider it unreasonable for Congress to enact such a ban for one year only. The record lays out the competing public policy interests that the ban affects. The choice to balance such interests by temporizing — putting a ban in place for one year and requiring it to be reenacted the following year to remain in effect — is a valid exercise of legislative prerogative. Politics is, after all, the art of compromise.

In an effort to blunt the force of this reasoning, the appellees urge that the word "hereinafter" in Section 634 should be interpreted as a synonym for the word "hereafter" and thus regarded as a word of futurity. To justify this linguistic leap, they note the familiar canon that a statute should be interpreted so as to give meaning to every word and phrase. See Lopez-Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999); United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985). Building on this foundation, they assert that the phrase "this or any previous Act," contained in the rider, refers to the entire appropriations bill and all previously enacted legislation. Thus, interpreting "hereinafter"

-10-

according to its common meaning — "in the following part of this writing or document," Webster's Third New Int'l Dict. 1059 (1993) — would render the reference to "this . . . Act" superfluous. For "this or any previous Act" to make sense, the appellees say, Congress must have meant "hereinafter" to mean "hereafter," thereby signifying all subsequent legislation. In their view, this converts "hereinafter" into a word of futurity (and, thus, makes Section 634 permanent law).

We are unwilling to take such liberties with the King's English. Canons of construction are valuable interpretive tools, but they cannot be applied woodenly. Context is important — and the fact that the language in question appears in an appropriations bill is highly significant. That fact requires us to adhere to the accepted meanings of the words Congress chose when doing so does not lead to an implausible result. See Minis, 40 U.S. at 445; Martinez, 277 F.3d at 149-50; see also 31 U.S.C. § 1301(c)(2). Congress selected the word "hereinafter," and that word, in its universally accepted meaning, refers to that which follows in the same writing. The appellees have been unable to cite any respectable authority for the proposition that "hereinafter" and "hereafter" can be used synonymously. Under such circumstances, we must eliminate all reasonable interpretations of the language that Congress chose before dropping out an inconvenient syllable and twisting a word into an unfamiliar shape.

It is certainly plausible (and, thus, conclusive for our purposes) that Congress intended the phrase "[n]one of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce" as nothing more than a particularly emphatic way of stating the stock phrase "this or any other act," which appears regularly in appropriations bills. See GAO Principles at 2-30. "The words . . . 'this or any other act' are not words of futurity. They merely refer to any other appropriation act for the same fiscal year." Id. We think it not unlikely that Congress used the belt-and-suspenders version of this trite phrase for its broad spatial effect rather than to breach temporal barriers. Since the rudimentary phrase fails to overcome the presumption against permanence in appropriations bills, Martinez, 277 F.3d at 146 n.2, the rephrasing of it, with only inconsequential variations, should not be deemed to establish permanence.

Moreover, interpreting Section 634 as limited to FY 2001 does not render any of the language superfluous, redundant, or without meaning. As the lower court recognized, Atl. Fish, 206 F. Supp. 2d at 90 & n.5, the phrase "this or any previous Act" unquestionably prohibited the use of monies appropriated either under Pub. L. No. 106-553 or before its enactment for licensing fishing operations that use spotter aircraft. But Congress customarily enacts a number of appropriations bills each year. See

GAO Principles at 1-15. Pub. L. No. 106-553 was but one of the multitude. It did not encompass all appropriations for FY 2001. It is, therefore, entirely possible that Congress followed "this or any previous Act" with "or hereinafter made available to the Department of Commerce" to ensure that the ban applied to any appropriations bills subsequently enacted for FY 2001, no matter the sequence in which Congress ultimately might pass the bills.

The reasonableness of this precaution hardly can be doubted. The appropriations cycle is notoriously unpredictable. Cf. Harold P. Coxson, Federal Construction Spending for FY2000: The Making of Law and Sausage, Construction Lawyer, Jan. 2000, at 45 (positing that Chancellor Bismarck's famous comparison of making laws to making sausage "is at no time more apt than during the appropriations process"). And the sockdolager is that Congress in fact made FY 2001 funds available to the Department of Commerce in an appropriations bill that was passed subsequent to Pub. L. No. 106-553. See Act of Dec. 21, 2000, Pub. L. No. 106-554, app. D §§ 207, 209, 2000 U.S.C.C.A.N. (114 Stat.) 2763, 2763A-176 to 179 (providing monies for FY 2001, in addition to those appropriated in Pub. L. 106-553, to fund NOAA operations, research, and facilities). Regardless of whether other legal impediments might have prevented these later funds from being used to authorize bluefin fishing with the aid of airborne spotters, Section 634's precautionary language guaranteed that any attempt to do so would

be futile.  Seen in this light, the word "hereinafter," interpreted in its usual and customary sense, is neither meaningless nor redundant as used in Section 634.

The appellees next embrace the district court's principal rationale:  that a conclusion of permanence is warranted by comparing Section 634 with Section 204.[4]  The district court reasoned that these two sections are peas in a pod — they contain identical "scope" language — and that Section 204 must create permanent law because it would be absurd to assume that Congress intended to extend the protections of Section 204 for only one year.  Atl. Fish, 206 F. Supp. 2d at 91-92.  Building on this foundation, the court concluded that since the two sections were enacted in the same appropriations bill, Section 634's identical "scope" language also must create permanent law.  Id.

This analysis might have some persuasive force if we looked only within the four corners of Pub. L. No. 106-553.  The Supreme Court has indicated, however, that, in the course of

_____

[4]Section 204 reads in pertinent part:

> None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce, shall be available to reimburse the Unemployment Trust Fund or any other fund or account of the Treasury to pay for any expenses . . . for services performed by [temporary Census workers].

Act of Dec. 21, 2000, Pub. L. No. 106-553, app. B § 204, 2000 U.S.C.C.A.N. (114 Stat.) 2762, 2762A-78 (emphasis supplied).

-14-

interpreting appropriations bills, courts may compare enactments in one year to corresponding enactments in other years in order to discern congressional intent. See, e.g., United States v. Mitchell, 109 U.S. 146, 148 (1883). The point of this comparison is to determine whether Congress believed it necessary to reenact the same provision from year to year. See, e.g., United States v. Dickerson, 310 U.S. 554, 556-57, 561 (1940). After all, if Congress annually reenacts a provision, common sense suggests — and courts are free to presume — that Congress did not consider the language as creating permanent law. See Vulte, 233 U.S. at 514.

An examination of appropriations prior to FY 2001 reveals that Congress regularly enacted the substance of Section 204, using the very same "scope" language, for eleven consecutive years.[5] This constant repetition convinces us of two things. First,

---

[5]See Act of Nov. 29, 1999, Pub. L. 106-113, app. A § 204, 1999 U.S.C.C.A.N. (113 Stat.) 1501, 1501A-31; Act of Oct. 21, 1998, Pub. L. 105-277, Div. A, § 101(b) [Title II, § 204], 1998 U.S.C.C.A.N. (112 Stat.) 2681, 2681-86; Act of Nov. 26, 1997, Pub. L. 105-119, Title II, § 204, 1997 U.S.C.C.A.N. (111 Stat.) 2440, 2479; Act of Sept. 30, 1996, Pub. L. 104-208, Div. A, Title I, § 101(a) [Title II, § 204], 1996 U.S.C.C.A.N. (110 Stat.) 3009, 3009-39; Act of Apr. 26, 1996, Pub. L. 104-134, Title I, § 101(a) [Title II, § 204], 1996 U.S.C.C.A.N. (110 Stat.) 1321, 1321-30 (renumbered Title I Pub. L. 104-140, § 1(a), May 2, 1996, id. at 1327); Act of Aug. 26, 1994, Pub. L. 103-317, Title II, § 204, 1994 U.S.C.C.A.N. (108 Stat.) 1724, 1749; Act of Oct. 27, 1993, Pub. L. 103-121, Title II, § 204, 1993 U.S.C.C.A.N. (107 Stat.) 1153, 1177; Act of Oct. 6, 1992, Pub. L. 102-395, Title II, § 204, 1992 U.S.C.C.A.N. (106 Stat.) 1828, 1855; Act of Oct. 28, 1991, Pub. L. 102-140, Title II, § 204, 1991 U.S.C.C.A.N. (105 Stat.) 782, 806; Act of Nov. 5, 1990, Pub. L. 101-515, Title I, § 104, 1990 U.S.C.C.A.N. (104 Stat.) 2101, 2108.

Congress plainly intended Section 204 as temporary, not permanent,[6] law. "[R]epeated inclusion of a provision in annual appropriation acts indicates that it is not considered or intended by Congress to be permanent." GAO Principles at 2-30 to 2-31. Second, the comparison between Section 204 and Section 634 undermines, rather than supports, the appellees' position: it would be counterintuitive to assume that Congress borrowed language that historically created temporary law from one provision of an appropriations bill with the intent that the borrowed language, when used elsewhere, would establish permanent law.

The appellees make one last effort to persuade us. They note that some other provisions in Pub. L. No. 106-553 use language that flatly limits their application to FY 2001. See, e.g., Section 203, 2000 U.S.C.C.A.N. at 2762A-78 (stipulating that "[n]one of the funds made available by this Act" can be used beyond FY 2001); Section 616, id. at 2762A-106 (similar). Invoking the tenet that Congress should be deemed to act intentionally when it

---

[6]The court below found it significant that Section 204 referred to "decennial censuses." Atl. Fish, 206 F. Supp. 2d at 91. Because this reference is in the plural, the court inferred, it must create permanent law. Id. at 91-92. We do not think that this word choice can bear the weight of the court's conclusion. The change actually occurred in FY 2000 rather than FY 2001. See 1999 U.S.C.C.A.N. at 1501A-31. Prior to FY 2000, Section 204 mentioned only the 1990 census. See, e.g., 1998 U.S.C.C.A.N. at 2681-86. The most that can be made of the naked change from the singular to the plural is that the language refers to both past and current censuses. This is made evident by the fact that the plural usage was repeated in FY 2001. See 2000 U.S.C.C.A.N. at 2762A-78.

includes particular language in one section of a statute but omits it in another section of the same statute, see Duncan v. Walker, 533 U.S. 167, 173 (2001), the appellees argue that Congress indicated its intent to make Section 634 permanent law by omitting any such categorical directive. We are not persuaded.

Although the canon of construction described by the Duncan Court is "generally presumed," id., that canon cannot be applied indiscriminately. Here, unlike in Duncan, a separate statute, 31 U.S.C. § 1301, instructs us on how to interpret appropriations bills, and that statute, backed by over a century and a half of uniform judicial precedent, commands us to indulge the very specific presumption that provisions in an appropriations bill are to be considered temporary unless Congress expressly states a contrary intent.

Even more compellingly, a proviso in the same appropriations bill states unequivocally that "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein." Pub. L. No. 106-553, app. B § 602 (Section 602), 2000 U.S.C.C.A.N. at 2762A-103. This proviso not only reinforces the historic presumption against permanence but also demonstrates that Congress, in this instance, chose to travel that path. The language of Section 602 makes manifest that Congress endorsed the setting of the sun on each and every provision in the FY 2001

-17-

appropriations bill — including Section 634 — at the end of that fiscal year absent an express direction to the contrary. The text of Section 634 contains no words of futurity adequate to overcome the mandate of Section 602.

These facts add up to an easily predictable result: for purposes of statutory construction, a general judicial presumption necessarily must yield to a specific, clearly articulated statutory directive. Cf. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384-85 (1992) (invoking the principle that, in statutory construction, "the specific governs the general" to resolve a conflict between two statutes).[7]

The Intervenors make two additional arguments. First, they maintain that "the repetition of a provision in the following year's appropriation act [should] be viewed simply as an 'excess of caution.'" GAO Principles at 2-31. But the GAO Principles support such a conclusion only where adequate words of futurity have been used. See id. ("[I]f the provision does not contain words of futurity, repetition or non-repetition lead [sic] to the same result — that the provision is not permanent."). No such words exist here. Thus, the argument collapses of its own weight.

---

[7]Even if we were to apply the canon of construction touted by the appellees to the appropriations bill at issue here, it would lead, at best, to an inconclusive result. This is so because Congress used clear and adequate words of futurity in other provisions of the appropriations bill, see, e.g., app. A § 135, 2000 U.S.C.C.A.N. at 2672A-31; app. B § 111, id. at 2762A-68, but not in Section 634.

-18-

The Intervenors also float the suggestion that Section 634 is immune to the September 30, 2001 expiration because NOAA's activities are funded by "no-year" appropriations. This suggestion does not withstand scrutiny.

It is true that "[w]hen Congress expressly provides in an appropriation . . . that it shall 'remain available until expended[,]' all statutory time limits as to when the funds may be obligated and expended are removed." Appropriations — No-Year — Effect of Subsequent Limitations, 40 Comp. Gen. 694, 696 (1961), 1961 WL 1677, at *3. That means, however, that "limitations on . . . specific items contained in such appropriations are to be considered as available without regard to fiscal year unless otherwise specified." Id. (emphasis supplied). "[T]he availability of such appropriations is not changed by a later act, except in such respects and to such extent as is expressly stated or clearly implied by such act." Id. at 697.

The language upon which the Intervenors base their suggestion reads: "For necessary expenses of activities authorized by law for the [NOAA] . . . to remain available until expended . . . ." 2000 U.S.C.C.A.N. at 2762A-74 to 75. This language appears in Title II of Pub. L. No. 106-553. It appropriates funds for specific activities of the Department of Commerce and its constituent agencies and frees those appropriations, notwithstanding any limitations thereon that are organic to the

appropriating language, from fiscal year limitations. Section 634, however, is not organic to Title II's no-year appropriations. It appears later in the Act as a separate and general provision under Title VI and, as we already have determined, it contains no words of futurity. The language to which the Intervenors advert contemplates that the no-year funds are to be used for "activities authorized by law." (Emphasis supplied). During the 2001 fishing season, issuing permits that allowed the use of airborne spotters in the hunt for bluefin would not have been authorized by law because such an action would have flouted Section 634. Given the limited temporal reach of that provision's language, however, issuing permits containing a restriction on the use of airborne spotters for subsequent fishing seasons would not have been authorized, see supra note 3, and, thus, would be inconsistent with the terms of NOAA's funding legislation.

## III. CONCLUSION

We need go no further. Deciding what funds shall be appropriated from the public fisc and how that money is to be spent is a task that the Constitution places in the congressional domain. Exercising that authority, Congress instituted a ban on the use of airborne spotters that lapsed at the end of FY 2001. Congress can continue the ban either by reinserting it in future appropriations bills or by enacting separate substantive legislation. To date,

-20-

Congress has not taken any such step.  We refuse to fill this void by finding permanent law where none exists.

Because the ban articulated in Section 634 was not in effect after September 30, 2001, the district court erred in entering judgment for the appellees.

**<u>The order appealed from is reversed and the cause is remanded to the district court with instructions that the court grant the appellants' motion for brevis disposition and issue a declaration of the parties' rights consistent with this opinion</u>**.