STEPHEN G. DENT *v.* ALLEN F. LOVEJOY ET AL.
(AC 23009)

Bishop, West and Peters, Js.

Argued March 29—officially released October 12, 2004

*Michael R. Pontrelli*, pro hac vice, with whom was *James R. Fogarty*, for the appellant-appellee (plaintiff).

*Douglas R. Steinmetz*, with whom was *Calvin K. Woo*, for the appellees-appellants (substitute defendants).

*Opinion*

WEST, J. The plaintiff, Stephen G. Dent, appeals from the judgment of the trial court, rendered after a trial to the court, denying his request for a declaratory judgment, injunctive relief and damages resulting from the presence of a European birch tree within the boundaries of a view easement. On appeal, the plaintiff claims that the court improperly construed the language in his deed as exempting from the view easement those trees and shrubs planted before March 1, 1956. The substitute defendants, Allen P. Lovejoy, Charles F. Lovejoy and Jennifer L. Craddock, cross appeal from that portion of the judgment granting the plaintiff's request for the same relief with respect to a grey birch clump that also exists within the boundaries of the view easement. On cross appeal, they claim that the court improperly (1) concluded that the grey birch clump was subject to the view easement, (2) failed to consider their special

defense that the view easement was terminated by prescription, (3) awarded $8000 in damages to the plaintiff for the interference with his use and enjoyment of the view easement and (4) failed to consider the testimony of the view easement's grantor as to his intent in granting the easement. We reverse in part the judgment of the trial court.

The following facts are relevant to these appeals. Sometime before 1956, Irven J. Brod acquired approximately fourteen acres of waterfront property in the Riverside section of Greenwich. The property contained a single stone residence, which stood at the crest of a hill, its axis running east to west and its rear facing southward, overlooking Cos Cob Harbor, Hannah Maria Island and Long Island Sound. Also facing southward were an attached terrace and a sunken garden, from which the property sloped downward until it reached the shore of the harbor.

In 1956, Brod subdivided the fourteen acre parcel into nine lots, only one of which was developed. The developed lot consisted of the stone residence and almost two acres of surrounding land, which included the sunken garden. At its closest point, this lot was roughly 300 feet from the shoreline. Brod conveyed this lot to William McKeehan and Priscilla McKeehan by deed dated and recorded March 1, 1956.

In that deed, Brod granted the McKeehans a view easement. The relevant provision provides: "The grantor, on behalf of himself, his heirs and assigns, hereby covenants and agrees with the grantees and their heirs and assigns as follows: 1. That no building or structure of any type or road (exclusive of driveways) and that no solid fences of any type shall be constructed or maintained on the property of the Grantor lying southerly of the above described premises and lying between the two view lines shown on the above

described map. The grantor further covenants and agrees on behalf of himself, his heirs and assigns forever, that in the event the planting hereinafter planted within the area shown on said map lying between the two view lines shall exceed a height of six feet and in the further event that in the sole discretion of the owner of the premises herein conveyed such planting shall constitute an obstruction to the view of the waters of Mianus River, Cos Cob Harbor or Long Island Sound, such planting shall be ordered removed or trimmed or cut back by the owner of the premises herein described, provided such owner shall first have given thirty days written notice thereof to the owners of the premises upon which such obstruction shall be deemed to exist, and the owner of the premises herein described shall have the right to enter for such purposes. It is understood and agreed that the land lying between said view lines shall be deemed to include HANNAH MARIA ISLAND, only as to future structures and to future planting in excess of 12 feet in height." As explained by the trial court in its memorandum of decision, "[t]he map referred to was recorded Map 3557 'Property of William C. McKeehan,' which depicted . . . two 'view lines' extending as two radii from the back or south side of the residence out to the harbor so that the distance between the lines is seventy feet when they cross the southern boundary of the McKeehan property and approximately 220 feet as they cross the shoreline."

After conveying this lot to the McKeehans, Brod still owned the two hillside lots situated between the McKeehans' lot and the shore, both lots having portions burdened by the view easement. In 1960, Brod conveyed one lot, located to the southwest of the McKeehans' lot, to Allen F. Lovejoy and Betty F. Lovejoy; the other lot, located to the southeast of the McKeehans' lot and adjacent to the Lovejoys', he retained for himself. By

the mid-1960s, both Brod and the Lovejoys had built houses on their respective lots.

Some thirty years later, the plaintiff purchased the McKeehans' lot, thereby acquiring the benefit of the view easement. Shortly thereafter, he contacted the Lovejoys, who still resided at the same location, and asked them to remove or trim to a height of six feet all trees and shrubs within the boundaries of the view easement. The Lovejoys agreed to remove some and trim other plantings, but refused to do either with respect to a European birch tree, a grey birch clump and an Austrian pine tree, claiming that those plantings were exempt from the view easement because they were planted before March 1, 1956.

The plaintiff commenced this action in April, 1994, alleging, inter alia, that certain plantings on the Lovejoys' lot, located within the boundaries of the view easement, each in excess of six feet, obstructed the view from his property of the Mianus River, Cos Cob Harbor and Long Island Sound. As remedies, the plaintiff sought a declaratory judgment as to his rights under the view easement, a permanent injunction banning the Lovejoys from interfering with his rights under the view easement and money damages for the unlawful deprivation of his rights.

By answer filed October 20, 1994, the Lovejoys denied the plaintiff's material allegations and raised a number of special defenses, including termination by prescription. Before trial, Allen F. Lovejoy died, and his three children, Allen P. Lovejoy, Charles F. Lovejoy and Jennifer L. Craddock, were substituted as defendants in their capacity as executors of their father's estate and conservators of their mother's estate.

The matter was tried to the court, and, on April 9, 2002, the court issued a memorandum of decision. The court concluded that the phrase "planting hereinafter

planted" imposed a six foot height limitation only on trees and shrubs planted after March 1, 1956. Applying this interpretation to the plantings in dispute, the court concluded that the European birch tree, having been planted before that date, was exempt from the view easement; the grey birch clump, being "new, i.e., post-1956," was not exempt from the view easement; and the Austrian pine tree, having died, was no longer a tree but a solid obstruction that was banned by the view easement. The court awarded the plaintiff $8000 in damages to compensate for the loss of enjoyment as a result of the grey birch clump's interference with the view easement. This appeal followed. Additional facts will be provided as necessary.

## I

### THE PLAINTIFF'S APPEAL

The plaintiff claims that the court improperly construed the language in his deed as exempting from the view easement those trees and shrubs planted before March 1, 1956.[1] We agree.

The following additional facts are necessary to resolve the plaintiff's claim. At trial, the parties disputed the scope of the language in the view easement subjecting to the easement any "planting hereinafter planted" within the view lines. The plaintiff claimed that, read in its entirety, the deed expresses a single purpose: to preserve a panoramic view of Cos Cob Harbor and Long Island Sound for the plaintiff's prop-

---

[1] Preliminarily, we address the defendants' argument that the provision at issue is not an easement, but rather a restrictive covenant, which "must be narrowly interpreted, as the law does not favor restrictions on the use of land." Assuming, arguendo, that the provision at issue is a restrictive covenant, the Restatement has "depart[ed] from the often expressed view that servitudes should be narrowly construed to favor the free use of land." 1 Restatement (Third), Property, Servitudes § 4.1, comment a, p. 497 (2000). Thus, semantics aside, the distinction between restrictive covenants and affirmative easements is immaterial in this case.

erty. He also indicated that the word "hereinafter" does not, according to any respectable authority, mean "hereafter" or "in the future." Conversely, the defendants, focusing on the word "hereinafter," argued that the language unequivocally exempts from the view easement those trees and shrubs planted before March 1, 1956. To bolster their interpretation, the defendants offered, over the plaintiff's objection, the testimony of Brod as to his intent in granting the view easement.

The court declined to consider Brod's testimony regarding his intent, but agreed with the defendants, nonetheless, that the view easement restricted to a height of six feet only those trees and shrubs planted after March 1, 1956. It did so for three reasons. First, the easement provision restricted only "future planting" on Hannah Maria Island. Second, the easement's essential purpose, according to the court, was to protect the view for the plaintiff's property from residential development (i.e., houses, roads and solid fences). Third, the language in the deed did not suggest that the parties contemplated any changes in the condition of the hillside, which contained one or more trees or shrubs in excess of six feet. We disagree with the court.

"[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences. . . . The meaning and effect of the [language in the deed] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . . The primary rule of interpretation . . . is to gather the intention of the parties from their words, by reading, not

simply a single clause of the agreement but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met." (Internal quotation marks omitted.) *Bird Peak Road Assn., Inc.* v. *Bird Peak Corp.*, 62 Conn. App. 551, 557, 771 A.2d 260, cert. denied, 256 Conn. 917, 773 A.2d 943 (2001).

"[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. *A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity* . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Emphasis added; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000).

"The fact that servitudes are intended to bind successors to interests in the land, as well as the contracting parties, and are generally intended to last for an indefinite period of time, lends increased importance to the writing because it is often the primary source of information available to a prospective purchaser of the land. The language should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved. Searching for a particular meaning adopted by the creating parties is generally inappropriate because the creating parties intended to bind and benefit successors for whom the written record will provide the primary evidence of the

servitude's meaning." 1 Restatement (Third), Property, Servitudes § 4.1, comment (d), pp. 499–500 (2000).

With those principles in mind, we look to the disputed language in the context of the entire deed to determine whether an ambiguity exists. After prohibiting the construction of any building, structure, road or solid fence between the view lines, the easement provision provides in relevant part that "in the event the *planting hereinafter planted* within the area shown on said map lying between the two view lines shall exceed a height of six feet and in the further event that in the sole discretion of the owner of the premises herein conveyed *such planting* shall constitute an obstruction to the view of the waters of Mianus River, Cos Cob Harbor or Long Island Sound, *such planting* shall be ordered removed or trimmed or cut back by the owner of the premises herein described . . . ." (Emphasis added.)

In its memorandum of decision, the court focused primarily on the phrase "planting hereinafter planted," interpreting "hereinafter" as a synonym for the word "hereafter." Acknowledging that "the word 'hereinafter' does not mean in the future, or even hereafter," and that, in fact, it "connotes something to follow within, e.g., coming afterward in a document," the court concluded, nevertheless, that to read "hereinafter" in its customary sense would "necessitate essentially reading out of the view easement language the entire phrase 'planting hereinafter planted.' " We disagree.

In *Atlantic Fish Spotters Assn.* v. *Evans*, 321 F.3d 220, 225 (1st Cir. 2003), the defendants asked the court to interpret the word "hereinafter" in an identical manner as the defendants here: "[T]he [defendants] urge that the word 'hereinafter' . . . should be interpreted as a synonym for the word 'hereafter' and thus regarded as a word of futurity." As here, "[t]o justify this linguistic leap, [the defendants] note[d] the familiar canon that

a statute should be interpreted so as to give meaning to every word and phrase." Id. The court rejected the defendants' interpretation, stating that it was "unwilling to take such liberties with the King's English. . . . Congress selected the word 'hereinafter,' and that word, in its universally accepted meaning, refers to that which follows *in the same writing*. The [defendants] have been unable to cite any respectable authority for the proposition that 'hereinafter' and 'hereafter' can be used synonymously. Under such circumstances, we must eliminate all reasonable interpretations of the language that Congress chose before dropping out an inconvenient syllable and twisting a word into an unfamiliar shape."[2] (Citations omitted; emphasis in original.) Id., 225–26.

Here, it is certainly reasonable that the parties intended to use the word "hereinafter" in its customary sense, namely, to refer to that which follows in the same provision. Indeed, after the phrase "planting hereinafter," the phrase "such planting" is used twice. " 'The word "such" has been construed as a related adjective referring back to and identifying something previously spoken of and that it naturally, by grammatical usage, refers to the last precedent.' " *Nichols* v. *Warren*, 209 Conn. 191, 197, 550 A.2d 309 (1988). The last precedent to "such planting" is the word "planting" in the phrase "planting hereinafter." Thus, we think it not unlikely that the parties intended that the phrase "planting hereinafter" refer to "such planting" and that "such planting" refer to those "planted within the area shown on said

---

[2] Here, the defendants cite a single dictionary that defines "hereinafter" to mean "hereafter": the Cambridge Advanced Learner's Dictionary (2003 Ed.)—not quite the respectable authority mentioned in *Atlantic Fish Spotters Assn*. The plaintiff, to the contrary, cites Webster's New World Dictionary (College Ed. 1953), which defines "hereinafter" as "in the part after this part (of this document, speech, etc.)." He also cites Webster's New International Dictionary (2d Ed. 1955), which defines "hereinafter" similarly as "[i]n the following part of this (writing, document, book, etc.)."

map lying between the two view lines;" nor do we think it unlikely that the parties chose "this trite [word] for its broad spatial effect rather than to breach temporal barriers." *Atlantic Fish Spotters Assn.* v. *Evans*, supra, 321 F.3d 226.

Even so, we cannot consider the word "hereinafter" in isolation, without taking into account the rest of the deed's language. As noted previously, "[t]he primary rule of interpretation . . . is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement but the entire context . . . ." (Internal quotation marks omitted.) *Bird Peak Road Assn., Inc.* v. *Bird Peak Corp.*, supra, 62 Conn. App. 557.

For three reasons, we conclude that, when read in the context of the entire deed, the word "hereinafter" takes on its customary import. First, the easement provision explicitly restricts "future planting" only as would restrict the view of Hannah Maria Island. The provision's final sentence reads: "It is understood and agreed that the land lying between said view lines shall be deemed to include HANNAH MARIA ISLAND, *only as to* future structures and to *future planting* in excess of 12 feet in height." (Emphasis added.) The parties' specific use of the phrase "future planting" in that sentence indicates that they knew how to select language that would unequivocally exempt certain plantings from the view easement, so that their failure to do so earlier in the provision can be deemed deliberate.

Second, in the deed, the parties employed the word "hereinafter" in its customary sense on three separate occasions. See 11 S. Williston, Contracts (4th Ed. 1999) § 32:6, p. 432 ("[g]enerally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons"); cf. *Willow Springs Condominium Assn., Inc.* v. *Sev-*

*enth BRT Development Corp.*, 245 Conn. 1, 27, 717 A.2d 77 (1998) ("[w]here the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance" [internal quotation marks omitted]).

Third, read in its entirety, the easement provision conveys a single purpose: to protect the view of the Mianus River, Cos Cob Harbor and Long Island Sound. The provision explicitly prohibits the construction or maintenance of any building, structure, road or solid fence within the view lines. Further, it provides the owner of the dominant estate the right to deem a planting in excess of six feet *"an obstruction to the view of the waters of Mianus River, Cos Cob Harbor or Long Island Sound"*; and the right to enter the servient estate to trim or remove the offending planting or plantings. (Emphasis added.)

In sum, nothing in the deed's language indicates that the word "hereinafter" should be given a special or unusual connotation. See *Hoffman Fuel Co. of Danbury* v. *Elliot*, 68 Conn. App. 272, 280, 789 A.2d 1149, cert. denied, 260 Conn. 918, 797 A.2d 514 (2002). Because the use of that word is unambiguous, "there is no need to apply additional rules of interpretation, for in determining the effects of a deed or a written contract where the language is fairly susceptible of but one interpretation, the inquiry is not what the parties impliedly intended but what is the intent which is expressed, and that intent must be given effect. . . . The intention of the parties, gathered from their words, is gathered not by reading a single clause of the covenant but, as we have done, by reading its entire context. . . . It is only where more than one interpretation is permissible that it is necessary for this court to seek the intent of the doubtful language in the light of surrounding circumstances presumably considered by the parties." (Citations omitted.) *Moore* v. *Serafin*, 163 Conn. 1, 10–11,

301 A.2d 238 (1972). On the basis of the foregoing, we conclude that the view easement unambiguously restricts to a height of six feet all trees and shrubs planted within its boundaries (except, of course, those that would block the view of Hannah Maria Island), and that the court, therefore, improperly construed the language in the deed as exempting from the view easement those trees and shrubs planted before March 1, 1956.

## II

## THE DEFENDANTS' CROSS APPEAL

We now address the claims that the defendants raise in their cross appeal. They first claim that the court improperly concluded that the grey birch clump is subject to the view easement. According to the defendants, although the grey birch clump began sprouting after March 1, 1956, it sprouted from the trunk of a birch tree that existed (and died) before March 1, 1956. Thus, they argue, the grey birch clump is not a new tree or shrub planted after March 1, 1956, but rather an extension of the preexisting crown and root system of the original birch tree. Having already concluded in part I that the view easement applies to all plantings—regardless of their germination dates—that exist within the boundaries of the view easement, we reject the defendants' initial claim.

The defendants next claim that the court improperly failed to address their special defense that the view easement was terminated by prescription. The defendants indicate that the court specifically mentioned, but failed to address, this special defense in its memorandum of decision. This, they argue, warrants plain error review. We disagree.

"It is the responsibility of the appellant to move for an articulation in order to clarify the basis of the trial

court's decision should such clarification be necessary for effective appellate review of the issue on appeal. . . . It is, therefore, the responsibility of the appellant to move for an articulation or clarification of the record when the trial court has failed to state the basis of a decision. . . . [W]here the trial court's decision is ambiguous, unclear or incomplete, an appellant must seek an articulation . . . or this court will not review the claim." (Citation omitted; internal quotation marks omitted.) *Advanced Financial Services, Inc.* v. *Associated Appraisal Services, Inc.*, 79 Conn. App. 22, 39–40, 830 A.2d 240 (2003).

Our review of the record reveals that the defendants did not file a motion for articulation asking the court to address their special defense that the view easement was terminated by prescription. Thus, although the defendants have failed to utilize the procedural vehicles available to remedy the inadequacies in the record, they urge us to resolve the deficiencies in the memorandum of decision on appeal. See id., 40. The record, however, is inadequate for review of this claim. See id.; *Commissioner of Public Works* v. *Middletown*, 53 Conn. App. 438, 449, 731 A.2d 749, cert. denied, 250 Conn. 923, 738 A.2d 654 (1999). Nevertheless, the defendants may prevail on this claim under the plain error doctrine if such review is affirmatively requested. See *Menon* v. *Dux*, 81 Conn. App. 167, 172, 838 A.2d 1038, cert. denied, 269 Conn. 913, 852 A.2d 743 (2004). The defendants have made such a request, and we consider, therefore, whether plain error review is warranted in this case.

"As we have often stated, [p]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal

quotation marks omitted.) Id. "An important factor in determining whether to invoke the plain error doctrine is whether the claimed error result[ed] in an unreliable verdict or a miscarriage of justice." (Internal quotation marks omitted.) *State* v. *Knight*, 29 Conn. App. 675, 677, 617 A.2d 913 (1992).

Having thoroughly reviewed the record and the parties' briefs, we conclude that this case does not involve any such obvious error that "affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Menon* v. *Dux*, supra, 81 Conn. App. 172. "[P]lain error review is more appropriately applied to unambiguous instances of impropriety; for instance, where the trial court has failed to apply a clearly relevant statute to a case." *Feen* v. *New England Benefit Cos.*, 81 Conn. App. 772, 778, 841 A.2d 1193, cert. denied, 269 Conn. 910, 852 A.2d 739 (2004). That is not the case here, and we thus conclude that plain error review is unwarranted.

In their third claim, the defendants maintain that the court improperly awarded $8000 in damages to the plaintiff for the interference with his use and enjoyment of the view easement. The defendants argue that the plaintiff failed to prove actual damages with the requisite certainty. We disagree.

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . Although damages often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier . . . this situation does not invalidate a damage award as long as the evidence

afforded a basis for a reasonable estimate by the [trier] of that amount. . . . Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689–90, 697 A.2d 1137 (1997). "In order to be entitled to more than nominal damages for [the] interference with [his view easement], [the plaintiff] was required to demonstrate at trial either the diminution in the value of [his] property because of [the] interference with [his] easement . . . the cost to return the easement to its original state . . . or the difference in the value of the easement before the interference and its value after it was obstructed." (Citations omitted.) *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, 218 Conn. 474, 477, 590 A.2d 431 (1991).

Here, the court based its determination of damages primarily on the testimony and written appraisal report of Peter M. Trefny, a licensed real estate appraiser. According to the court, Trefny opined that "the loss of enjoyment as a result of a partial view obstruction could be calculated in a dollar value by estimating the percentage loss in value of the property itself resulting from an obstructed view and then applying that reduction to an estimated rental value of the house." The court noted that Trefny's "rental value approach may not be the best, or only, approach to valuing damages, but . . . it can provide a useful tool in that endeavor, if applied with several alterations." Applying those alterations, the court estimated that the grey birch clump "contributed to no more than 10 percent of the obstruction and, therefore, the Trefny model, as altered, would suggest damages in the amount of $6510."

The court concluded: "[R]easonable people could take issue with some, if not all, of the adjustments discussed above. Nevertheless, it provides some measure of support for the court's own damages assessment which is based on hearing all the testimony, reviewing all the exhibits and the opportunity to view the scene in person. Fair, just and reasonable damages, based on the minimal, but not inconsequential, impairment of the view by the grey birch clump is in the range of $750 to $1000 annually, making allowance for the tree's growth. Therefore, the court sets damages at $750 for the first year of [the plaintiff's] ownership, and increases the amount by $50 each succeeding year so that it reaches and remains at $1000 for the year ending June, 1999, and thereafter for a total of $8000 to date."

Having thoroughly reviewed the record, we cannot conclude that the court's damages award was clearly erroneous. There is certainly a basis in the record for its determination. Accordingly, the defendants' claim must fail.

The defendants' final claim is that the court improperly failed to consider the testimony of Brod as to his intent in granting the view easement.[3] "The meaning and effect of the reservation are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed . . . ." (Internal quotation marks omitted.) *Kelly* v. *Ivler*, 187 Conn. 31, 39, 450 A.2d 817 (1982). The court's decision not to consider Brod's testimony regarding his intent was proper.

On the plaintiff's appeal, the judgment is reversed as to the European birch tree, and the case is remanded for a hearing in damages with respect to any diminution in value of the plaintiff's land as a result of that tree's

---

[3] The court clearly stated in its memorandum of decision that "[Brod's] testimony about the intent of the language of the easement has not been considered."

interference with the view easement. On the defendants' cross appeal, the judgment is affirmed.

In this opinion the other judges concurred.