Timothy DOYLE; Greg Hagaman; Brian Lague; Anthony W. Richards; and Eric Edwards, Plaintiffs,

v.

HUNTRESS, INC. and Relentless, Inc., Defendants.

No. C.A. 01–409L.

United States District Court, D. Rhode Island.

Jan. 13, 2004.

Merlyn O'Keefe, Esq., Packer & O'Keefe, Peace Dale, RI, for Plaintiff.

J. Renn Olenn, Esq., Olenn & Penza, Warwick, RI, for Defendant.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

This matter comes before the Court on cross-motions for summary judgment, filed by both Plaintiffs and Defendants pursuant to Fed.R.Civ.P. 56(c). Plaintiffs, Timothy Doyle (Doyle), Greg Hagaman (Hagaman), Brian Lague (Lague), Anthony W. Richards (Richards) and Eric Edwards (Edwards), former deck hands on the fishing vessels *Persistence* and *Relentless,* bring this suit against the ships' corporate owners, Defendants Huntress, Inc. and Relentless, Inc., alleging that these corporations failed to provide the Plaintiff seamen with written contracts prior to proceeding on several fishing voyages, as required by 46 U.S.C. § 10601 (1988). Plaintiffs claim statutory damages under a companion statute, 46 U.S.C. § 11107

(1983). Defendants oppose Plaintiffs' motion and cross claim for summary judgment, alleging that their lay-share fishing agreements did not violate § 10601; that § 11107 creates no remedy for lay-share fishermen; and that Plaintiffs' claims are barred by waiver and laches. For the reasons articulated herein, the Court concludes that there are no issues of material fact remaining as to the application of §§ 10601 and 11107 to Plaintiffs' claims, and grants partial summary judgment to Plaintiffs on those issues, pursuant to Fed. R.Civ.P. 56(d). However, because the Court recognizes that genuine issues of material fact remain in dispute as to the Defendants' defenses of laches and waiver, the Court denies Defendants' cross-motion for summary judgment.

### Facts and Travel

Between the years 1993 and 2000, Defendants employed each of the Plaintiffs at various times as deck hands and crewmen on the vessels *Persistence* and *Relentless,* two fishing trawlers with home berths in Davisville, Rhode Island. The *Persistence* and *Relentless* are both 125 foot, steel-hulled freezer trawlers, weighing in excess of 20 gross tons, and are the only fishing vessels permanently operating out of the port at Davisville.

The Defendant corporations utilized what is commonly referred to as the "lay-share system" in paying seamen working on their boats. On any given fishing trip, the boat owners would employ approximately fourteen crewmen per trawler, and these crewmen would engage in commercial fishing along the New England and Mid Atlantic coastline, occasionally following fish further south. After the voyage was over, the ship owners would take the trip's catch and sell it for a profit, usually to a company called SeaFreeze,[1] who

---

1. Richard Goodwin, the President and principal share holder of both Huntress, Inc., and Relentless, Inc., is also the primary owner of

SeaFreeze, the company who typically purchased the fish caught by the *Persistence* and the *Relentless.*

would then hold the fish in a shore-side freezer for up to a year and a half.

Once the fish were sold, Defendants would deduct the trip expenses, and the remaining amount would reflect the net profits received from the fishing voyage. The ship owner would then retain a considerable portion of these profits, typically between 58 to 61 percent, and the remaining proceeds would be divided among the crewmen in the form of "shares." Each crewman who sailed with Defendants would be entitled to a share, or a fraction of a share, of these remaining net proceeds gleaned from the trip's catch. The size of each fisherman's share would be determined by the vessel's captain based on the seaman's performance on the voyage, and was not the product of bargaining or an agreement with the fisherman before leaving port. No crewmember would be told before the trip exactly what percentage of the catch he would receive when the voyage was over, as this determination was left to the discretion of the captain, based on his perception of a seaman's work during the trip. Generally, more experienced hands would perform better while out at sea, and thus would receive a larger share, while less experienced seamen would perform less optimally, and as a result receive a smaller share of the proceeds. However, the percentage, or "share" due each fisherman was left entirely to the captain's discretion, and no exact formula existed for determining the amount due each fisherman at the end of a voyage. Once the captain calculated the amount due each fisherman, the Defendant corporations would issue the seaman a check in that amount. No accounting of the trip was provided to the fishermen, and they were not informed what particular percentage or share of the proceeds their individual checks represented.

In some instances, this lay-share arrangement between the crewmen and the ship owners was the product of an oral agreement between the parties, but the agreement itself was never reduced to any form of writing. On other occasions, Defendants would have the seamen sign a form agreement prior to embarkation provided by their insurance company. This document, entitled "FISHING AGREEMENT (As required under the terms of the Commercial Fishing Industry Vessel Safety Act of 1988, 46 United States Code Sec. 10601)" included the following language describing the crew's compensation arrangement:

> 2. PAYMENT: The crewmember shall receive a share of the crew's net proceeds from the trip. The crew's net proceeds are defined as a percent of the net sales received by the owner for the trip's catch, less trip expenses and any other expense mutually agreed upon by the owner and crewmember. The crew is to be responsible for his share of vessel expenses catch or no catch, catch lost or catch sold but uncollectible.

Plaintiffs' Motion for Summary Judgment, Appendices 5(a) and 6(a).

A later version of this form used by Defendants employs the same language quoted above, but includes blanks for the amount of the seaman's share and the percentage of the catch to be divvied up amongst the crewmembers. *See* Plaintiffs' Motion for Summary Judgment, Appendix 8(a). Defendants purposefully left these blanks empty when the crewmember signed the agreement, as the seaman's share and the percentage of proceeds due the crew were not determined by Defendants until after the trip. These form "Fishing Agreement[s]" included a blank for the ship owner's signature, but they were never signed by either Huntress, Inc., Relentless, Inc., or a designated representative of the applicable corporation. Instead, the company's bookkeeper filled

in these blanks with the name and address of Richard Goodwin, the President and primary shareholder of both Huntress, Inc. and Relentless, Inc.[2] Goodwin does not recall specifically authorizing the bookkeeper to handwrite his name on these agreements.

Finally, on most trips the seamen would be required to sign a roster as they boarded the boat. This roster was also signed by the ship's captain, and it included the following disclaimer above the crewman's signature:

> By signing my name to this crew roster, I agree to the terms and conditions of the fishing agreement for the vessel I am boarding.

Plaintiffs' Motion for Summary Judgment, Appendix 3.

Although this statement makes reference to a "fishing agreement" between the parties, in many cases this one written sentence is the only documentation bearing witness to such an agreement. According to Goodwin, the central purpose of the crew rosters was not to serve as a fishing agreement, but rather to keep track of who went out on the boat. *See* Goodwin Deposition at 13.

Plaintiffs Richards and Hagaman never signed any written fishing agreements with Defendants, although they did sign crew rosters when boarding on most trips. Richards sailed on the *Relentless* for numerous trips between July 1995 and November 2000. Hagaman sailed on the *Relentless* for five trips from March 1996 to July 1996.

Plaintiff Doyle was a crewmember on the *Persistence* from January 1996 to March 1996 for approximately five trips, and on the *Relentless* from June 1995 to October 1997 for approximately 25 trips.

Doyle never signed a written fishing agreement for his trips on the *Relentless*, however, he did sign a form agreement, as described above, for his trips on the *Persistence*. This agreement is missing the year of its execution, however, Doyle believes it was signed January 18, 1996. Plaintiff Edwards sailed on the *Persistence* for approximately 49 trips, and on the *Relentless* for approximately four trips. His affidavit is silent as to the dates of these trips. He signed no written fishing agreement for his trips on the *Relentless*, but, similar to Doyle, signed a form agreement dated June 19, 1993 for his trips on the *Persistence*.

Plaintiff Lague sailed on the *Persistence* for one trip in July 1996, and on the *Relentless* for several trips from July 1996 through February 1999. Unlike the other fishermen who sailed on the *Relentless*, Lague did sign a written form fishing agreement, as described above, for his trips on that vessel. This agreement is signed July 15, 1996, and purports to cover only one year of sailing. Lague also signed a form agreement for his trip on the *Persistence*. This *Persistence* form agreement contains blanks, as described above, for the terms of Lague's share and the percentage of the proceeds assigned to the crew.

As noted above, Plaintiffs were employed as deck hands on Defendants' vessels for different periods of time between the years 1993 and 2000. In 2000, Plaintiffs' attorney, while reviewing settlement sheets for unrelated litigation, noticed that Defendants were paying their crewmembers differing amounts per trip for the same work, and that no written agreements were executed prior to embarkation documenting the exact terms of the each

---

**2.** The agreements do not describe Goodwin's position of authority within Huntress, Inc., and Relentless, Inc., the corporate owners of the vessel. Rather, it merely describes Goodwin himself as the owner of the vessel in question.

fisherman's wage or share, as required by 46 U.S.C. § 10601. According to Plaintiffs, this was their first notice that they were each paid different shares of the catch for the same work on board the *Persistence* and the *Relentless*. As a result of this observation, Plaintiffs filed suit against Defendants, as well as the different men serving as ship captains on the *Persistence* and the *Relentless* during the relevant time period, alleging that Defendants' violated § 10601, that Plaintiffs were entitled to statutory damages under § 11107, and common law breach of contract claims against the individual defendants. During discovery, Plaintiffs voluntarily dismissed their breach of contract claims against the individual defendants. Thus, the only remaining issues in this case are Plaintiffs' claims under § 10601 and § 11107 and the defenses that Defendants raise to these claims. Now, this writer will analyze the cross-motions for summary judgment.

## Discussion

### I. Jurisdiction

This case concerns a matter of admiralty law, and requires this Court to interpret two statutory provisions regulating the employment of seamen, 46 U.S.C. § 10601 and § 11107. As a result, this Court has original jurisdiction of the matter pursuant to Article III, sec. 2, of the United States Constitution and 28 U.S.C. § 1331, the fed-

---

**3.** Although Plaintiffs' complaint improperly alleges jurisdiction under 42 U.S.C. § 1331, a repealed provision in the United States Code dealing with Public Health and Welfare, Plaintiffs have also alleged that this Court has subject matter jurisdiction by virtue of this case arising in admiralty. As a result, the Court considers Plaintiffs' citation error harmless.

**4.** Here, in addition to Plaintiffs' and Defendants' cross-motions for summary judgment as to the application of 46 U.S.C. §§ 10601 and 11107 to lay-share fishermen, and the viability of Defendants' affirmative defenses,

---

eral question jurisdiction statute.[3] *See* 28 U.S.C. § 1331 (1980)("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

### II. Standard of Review

The parties have filed cross-motions for summary judgment as to all remaining issues in this matter, pursuant to Fed. R.Civ.P. 56(c). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). When a motion for summary judgment is filed, but "judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary," Fed.R.Civ.P. 56(d) enables the district court to "ascertain what material facts exist without substantial controversy and what material facts are in good faith controverted," and then issue an order "directing such further proceedings in the action as are just." *Id.* As a result, Rule 56(d) acts as a tool for the district court to "narrow the factual issues for trial." *Rivera–Flores v. Puerto Rico Tel. Co.,* 64 F.3d 742, 747 (1st Cir.1995).[4]

---

Plaintiffs have moved for summary judgment on the amount of their damages. In furtherance thereof, Plaintiffs have supplied the Court with numerous spreadsheets and supporting affidavits, which Defendants contest. Because these damage calculations hinge on witness testimony and credibility determinations, this matter is not appropriate for summary judgment. If Defendants are ultimately held liable to Plaintiffs, a trial on damages will be necessary. As a result, this instant motion is more properly considered as a motion for partial summary judgment under Fed. R.Civ.P. 56(d).

As has been previously observed, motions for partial summary judgment under Rule 56(d) are subject to the same standard of review as their counterparts under Rule 56(c). *Russell v. Enterprise Rent–A–Car Co. of Rhode Island,* 160 F.Supp.2d 239, 249 (D.R.I.2001). Therefore, summary judgment on any count is only appropriate when there is no dispute as to any material fact and only questions of law remain. *Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996). A material fact is one affecting the lawsuit's outcome under the applicable law. *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education,* 915 F.Supp. 1267, 1279 (D.R.I.1996). Factual disputes are genuine when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To win summary judgment on a particular issue, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim at issue. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). When facing cross-motions for summary judgment under either Rule 56(c) or (d), "the district court must resolve all genuine factual disputes in favor of the party opposing each such motion and draw all reasonable inferences derived from the facts in that party's favor." *Atlantic Fish Spotters Ass'n v. Evans,* 321 F.3d 220, 223 (1st Cir.2003). However, at the summary judgment stage, there is "no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Mar. Shipping Authority,* 835 F.2d 932, 936 (1st Cir.1987). When hearing a motion for summary judgment, it is the responsibility of a trial judge to determine whether a reasonable trier of fact could find for the nonmoving party based on the admissible evidence, and to refrain from invading the province of the jury by weighing the evidence or making credibility determinations. *Mahan v. Boston Water & Sewer Comm'n,* 179 F.R.D. 49, 56 (D.Mass.1998).

III.   Lay–Share Fishing Agreements and 46 U.S.C. § 10601 (1988)

Plaintiffs' claim for relief rests upon this Court's interpretation of two statutes, 46 U.S.C. § 10601 (1988) and § 11107 (1983). Both of these statutes appear in Part G of Subtitle II to Title 46 of the United States Code, entitled "Merchant Seamen Protection and Relief." The Court agrees with both Plaintiffs and Defendants that no genuine issues of material fact remain regarding the application of these statutes to Plaintiffs' claim. When no genuine issues of fact remain for the trier of fact on a particular issue, and only questions of law are controverted, summary judgment is appropriate. *See* Fed.R.Civ.P. 56(c); *Blackie,* 75 F.3d at 721. Thus, as both Plaintiffs and Defendants argue that they are entitled to summary judgment as a matter of law, this writer turns to the interpretation of § 10601 and § 11107, the statutes at issue.

The first of these statutes, at the time Plaintiffs allege that Defendants violated its tenets, read as follows:

§ 10601.   Fishing agreements

(a) Before proceeding on a voyage, the master or individual in charge of a fishing vessel, fish processing vessel, or fish tender vessel shall make a fishing agreement in writing with each seaman employed [sic] on board if the vessel is—

142

(1) at least 20 gross tons . . . ; and

(2) on a voyage from a port in the United States.

(b) The agreement shall also be signed by the owner of the vessel.

(c) The agreement shall—

(1) state the period of effectiveness of the agreement;

(2) include the terms of any wage, share, or other compensation arrangement peculiar to the fishery in which the vessel will be engaged during the period of the agreement; and

(3) include other agreed terms.[5]

46 U.S.C. § 10601 (1988).

Defendants argue that their lay-share fishing agreements with the Plaintiffs, in all their forms, satisfy both "the language and spirit" of § 10601, and thus, Plaintiffs are not entitled to a recovery. Plaintiffs argue that Defendants did violate § 10601 by failing to secure specific written agreements with each fisherman prior to embarkation as the statute mandates. Determining whether Defendants violated this statute requires an examination of the statutory language, determination of its meaning, and an application of the language to the facts of each Plaintiff's situation.

When interpreting a statute, the canons of construction dictate that the construing court must first look to the language of the provision itself, and "assume that the words of the statute comport with their ordinary meaning, and that their or-

dinary meaning accurately expresses legislative intent." *Laaman v. Warden, New Hampshire State Prison,* 238 F.3d 14, 16 (1st Cir.2001). Where the language of the statute is clear on its face, contains no ambiguities, and will not lead to an unreasonable result when applied, then statutory construction should begin and end with the language as written. *Atlantic Fish Spotters,* 321 F.3d at 223–24. When statutory language "points unerringly in a single direction, and produces an entirely plausible result, it is unnecessary—and improper—to look for other signposts or to browse in the Congressional archives." *U.S. v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.1987).

This writer agrees with the Ninth Circuit that § 10601 is "perfectly clear facially." *Seattle–First Nat. Bank v. Conaway,* 98 F.3d 1195, 1197 (9th Cir.1996). By its plain language, § 10601 requires those owning and operating fishing vessels of a certain weight out of United States ports to enter into written agreements with those seamen retained to serve on board. The statute does not stop there, however. It further regulates these fishing agreements by statutorily proscribing which parties are to sign the contract, when the contract will be executed, and what terms each agreement will include. Thus, § 10601 requires fishing vessels weighing at least 20 gross tons and embarking from United States ports to satisfy the following requirements when retaining seamen:

---

**5.** Section 10601 was amended in 2002 by Pub.L. 107–295, § 441(a) and (b)(1)-(3). *These amendments delete the language formerly in subsection (b) requiring written fishing agreements to be signed by the owner of the vessel, and replace it with language requiring "the owner, charterer, or managing operator, or a representative thereof, including the master or individual in charge" of the fishing vessel to make a written fishing agreement with each seamen employed on a vessel prior to embarkation. At the time that Plain-* tiffs sailed with Defendants, however, this amendment was not in place, and thus Defendants were statutorily required by § 10601 to have their written fishing agreements signed by a authorized representative of the vessel's corporate owner. *See Flores v. American Seafoods Co.,* 335 F.3d 904, 915–16 (9th Cir. 2003) (holding that § 10601(b)'s prior language requiring the owner's signature was not violated when a designated representative signed in his or her stead).

1) The person in charge of the vessel must make a written contract with those seamen he intends to retain for the fishing voyage.

2) There must be a separate contract with each seaman, entered into before leaving port, and signed by the owner of the vessel.

3) These agreements must state the effective time period, include the terms of any wage, share, or other compensation arrangement contemplated, and any other terms agreed upon by the seaman and the vessel owner.

■ Although Defendants do not dispute that § 10601 plainly applies to both large fishing trawlers, such as the *Persistence* and the *Relentless,* and to the lay-share fishermen working such ships, Defendants ask that this Court refrain from interpreting § 10601 as requiring large fishing boat owners to enter into written contracts with their crewmen before leaving shore on a fishing voyage. Essentially, Defendants argue that § 10601 does not foreclose the owners of fishing trawlers from entering into oral contracts with their crewmembers, but, rather, works with the following statutory subsection, 46 U.S.C. § 10602 (1988), to provide a statute of limitations for filing suit as an incentive for those boat owners who choose to enter into written fishing agreements. Thus, Defendants suggest that this Court view § 10601 and § 10602 as a collective "carrot" held out to trawler owners rather than a statutory "stick" intended to force ship owners' compliance. However, given the use of the mandatory term "shall" throughout § 10601, this writer finds Defendants' argument unpersuasive.

Defendants also argue that interpreting § 10601 as requiring written contracts between ship owners and fishermen would lead to an unreasonable result, suggesting that such an interpretation would overturn the age-old practice of fishing for lay-shares, a system that has existed in New England and other areas for hundreds of years. Defendants argue that lay-share fishing is "the last true meritocracy," because it allows fishermen of all ages and experience levels to venture to sea on equal footing, and be compensated based on the quality of their performance. The vessel owners suggest requiring written contracts for lay-share fishermen would effect a substantial change in law and policy not intended by Congress when it rearranged and recodified federal maritime law twice in the 1980s, thereby enacting § 10601 and repealing is predecessor statute, 46 U.S.C. § 531 (rep.Sept.9, 1988), which had existed since 1813. In addition, they argue that devising term-specific contracts with lay-share fishermen before leaving port would be absurd, because the captain would have no basis for assigning appropriate shares to the different seamen without first observing the quality of their work.

Although Congress recodified § 531 as § 10601 in 1988, this statutory section regulating fishing agreements, since its earliest version was enacted in 1813, has always required a written contract between working fishermen and those in charge of the vessel, and has always required the contract to be made before leaving port on the voyage. *See Crowell v. United States,* 6 F. Cas. 912, 912–13 (C.C.D.Mass.1856) (observing that the "act of Congress of July 29, 1813 (3 Stat. 52)" required ship masters of vessels in excess of twenty tons to make written fishing agreements with each fisherman "according to the provisions of the act" before embarkation). Although recodified, first as § 531, and then much later as § 10601, this language requiring a pre-venture, term-specific, written fishing agreement for large food-fishing vessels has remained constant over the years. Indeed, the 1988 recodification merely extended the scope of the statute

to apply to all fishing vessels in excess of twenty gross tons, regardless of the type of fish pursued. *See Manchester v. Massachusetts,* 139 U.S. 240, 264–65, 11 S.Ct. 559, 35 L.Ed. 159 (1891) (holding that the statute's prior codification, which mentioned by name only cod and mackerel fisheries, applied to all food fisheries).

Thus, the Court disagrees with Defendants that Congress did not intend to require written contracts for lay-share fishermen when it enacted § 10601. On the contrary, this writer believes that Congress intended to mandate written fishing agreements negotiated prior to departure. Such an interpretation is consistent with the age-old notion that Congressional action in admiralty cases is largely remedial in nature, devised to provide further protection for the rights and needs of seamen, who have been traditionally viewed as wards of the Court. *See American Foreign Steamship Co. v. Matise,* 423 U.S. 150, 160, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975); *Garrett v, Moore–McCormack Co.,* 317 U.S. 239, 246, 63 S.Ct. 246, 87 L.Ed. 239 (1942); *Fuller v. Golden Age Fisheries,* 14 F.3d 1405, 1408 (9th Cir.1994).

This Court disagrees with Defendants' assertion that devising term specific contracts would lead to an absurd result. Mandating written contracts prior to embarkation merely fosters pre-voyage bargaining between the fisherman and the captain regarding what share of the proceeds a seaman is worth, and protects the fisherman from arbitrary discrimination by the captain once the voyage is underway. This statutory interpretation levels the playing field for the seaman, ensuring more equal bargaining position between a fisherman and a vessel owner. Thus, this writer concludes that no unreasonable result would follow from interpreting § 10601 to require written contracts for seamen sailing on large fishing vessels before leaving port.

Having interpreted the statute, this writer turns to the different types of fishing agreements Defendants had with Plaintiffs. At issue are four types of fishing agreements utilized at different times by Defendants: 1) oral agreements; 2) form agreements with generic "share" language, signed by the fisherman and the corporations' bookkeeper; 3) form agreements as described, but with blanks for the "share" terms; 4) crew roster sign-in sheets, with disclaimer language. Plaintiffs argue that all of Defendants' purported fishing agreements were insufficient to satisfy the requirements of § 10601. The Court agrees.

■ By definition, oral agreements do not satisfy the statute, as § 10601 requires Defendants to have written agreements with their crew members. Likewise, the crew roster sheets fail to meet the requirements outlined in § 10601, as they were not independently executed with each seaman, were not signed by the vessel owner or a designated representative, and do not even attempt to describe the terms of a fisherman's compensation arrangement or the effective dates of engagement. The Court concludes that Defendants' disclaimer language at the top of these sign-in rosters was insufficient to satisfy the written contract requirement of § 10601.

■ Further, both versions of the form agreements provided by Defendants' insurance company fail to satisfy the requirements outlined in § 10601. Specifically, these agreements were required to specify the terms of each seaman's compensation arrangement, including the amount of the seaman's anticipated "share" in the proceeds of the catch. *See* 46 U.S.C § 10601(c)(2) ("The [fishing] agreement shall ... include the terms of any wage, share, or other compensation arrangement peculiar to the fishery in which the vessel will be engaged...."). Although the agreements do include gen-

eral language describing the concept of Defendants' lay-share payment system, they are silent as to the specific size of each seaman's anticipated share and what percentage of the voyage proceeds were intended to be divided amongst the crewmembers. Because Plaintiffs were fishermen working for shares, § 10601 required Defendants to include "the terms of any ... share" each seaman could expect to receive in exchange for his work on the vessel during a given voyage. Failing to include these terms in a written contract before putting out to sea places Defendants in violation of the statute.

Defendants argue that these agreements satisfy § 10601 because the language used adequately describes the "compensation arrangement peculiar" to the lay-share fishing industry. This argument ignores the fact that Plaintiffs were working for shares, and thus, by the plain language of § 10601, Defendants were required to include the specific terms of those shares in their written fishing agreements with Plaintiffs. However, putting aside the fact that Plaintiffs were working for shares, the existing agreements still fail to meet the requirements of § 10601, as they fail to completely describe the terms of the compensation arrangement maintained by Defendants. The purported fishing agreements are silent as to who determines the appropriate share each seaman will receive, what factors will be considered in making this determination, when this determination will be made, and do not describe Defendants' policy of compensating different seamen with different size shares based on voyage performance. Because these essential terms were missing from the agreements, they fail to satisfy the statute. Defendants' contracts with blanks are also deficient, as they even further emphasize that certain essential terms of Defendants' fishing agreement with Plaintiffs were not memorialized in writing, as required by § 10601.

Defendants argue at length that their act of having the corporate bookkeeper for Huntress, Inc. and Relentless, Inc. handwrite "Richard Goodwin" on their fishing agreements with Plaintiffs satisfies that part of § 10601 requiring the owner's signature on the contract. Because this writer finds that all versions of the fishing agreements used by Defendants violate § 10601 because they omit necessary terms, the Court need not address this argument. Thus, having determined that Defendants violated § 10601 in their dealings with each of the Plaintiffs, the Court grants Plaintiffs' motion for summary judgment on this issue. This writer now turns to the statutory consequences of such a violation.

IV. Statutory Construction and 46 U.S.C. § 11107 (1983)

Plaintiffs argue that a statutory penalty for violating the mandatory provisions of § 10601 exists within a companion statute in the same Part and Title, 46 U.S.C. § 11107 (1983). This second statute reads as follows:

§ 11107. Unlawful engagements void

An engagement of a seaman contrary to a law of the United States is void. A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of the engagement, whichever is higher.

46 U.S.C. § 11107 (1983).

The fishermen argue that Defendants' engagement of lay-share fishermen in violation of § 10601 constitutes the "engagement of a seaman contrary to a law of the United States," as described in § 11107. Thus, Plaintiffs ask this Court to rule that Defendants' purported fishing agreements with Plaintiffs are void as a matter of law,

and impose on Defendants § 11107's statutory wage penalty as to each Plaintiff for all the voyages at issue. In support of this argument, Plaintiffs rely on decisions from the Ninth Circuit and the Alaska Supreme Court interpreting these two statutes in conjunction with one another, and holding that § 11107 provides a statutory default wage for lay-share fishermen when ship owners fail to comply with the requirements of § 10601. *See Flores,* 335 F.3d at 912; *Harper v. United States Seafoods LP,* 278 F.3d 971, 977 (9th Cir.2002); *TCW Special Credits v. Chloe Z Fishing Company, Inc.,* 129 F.3d 1330, 1333 (9th Cir. 1997); *Seattle–First Nat. Bank,* 98 F.3d at 1198; *Bjornsson v. U.S. Dominator, Inc.,* 863 P.2d 235, 238–39 (Alaska 1993). This is a matter of first impression in this Circuit, and these reported decisions are the only ones to have considered this issue since Congress reorganized, modified, and recodified our country's maritime laws in the 1980s.

■ The proper interpretation of § 11107 is also a question of statutory construction. As this writer stated previously, when interpreting a statute, the court must first consider the language as written by Congress, and when this statutory language is clear on its face, and free of ambiguities, the statute must be applied as written. *See Plumley v. Southern Container, Inc.,* 303 F.3d 364, 369, 371 n. 5 (1st Cir.2002); *Atlantic Fish Spotters,* 321 F.3d at 223–24. Additional statutory construction by a court is only proper where a statute is ambiguous, or would lead to an unreasonable result where applied. *U.S. v. Charles George Trucking Co.,* 823 F.2d at 688.

■ After a thorough examination of § 11107, this writer must conclude that it is clear on its face, and not ambiguous or misleading. The statute plainly states that "[a]n engagement of a seaman contrary to a law of the United States is void." 46 U.S.C. § 11107. This admonition clearly applies to the engagement of any "seaman," as that term is defined within the statute, contrary to the laws of the United States. Thus, because Defendants contracted with Plaintiffs in violation of § 10601, their purported fishing agreements were void as a matter of law, and Plaintiffs are now statutorily entitled to recover "the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher." 46 U.S.C. § 11107.

It is clear that Plaintiffs, as lay-share fishermen, fall within the statute's terminology. While it is true that § 11107 uses the term "seaman" rather than fisherman, this term's meaning within Part G is not ambiguous. The definition section of Part G, 46 U.S.C. § 10101 (1996), defines the term "seaman" as "an individual (except scientific personnel, a sailing school instructor, or a sailing school student) engaged or employed in any capacity on board a vessel." Thus, by the terms of the act itself, a lay-share fisherman is included within the definition of seaman. Furthermore, § 10601, which clearly deals with fishing agreements, describes lay-share fishermen as seamen. Finally, unlike some other sections within Part G, which specifically exclude lay-share fishermen, § 11107 includes no such provision indicating Congressional intent to limit the statute's application to merchant seamen. *See, e.g.,* 46 U.S.C. § 10301 (1996)(excluding vessels "on which the seamen are entitled by custom or agreement to share in the profit or result of a voyage"); 46 U.S.C. § 10509 (1983) (excluding fishing vessels and yachts).[6] Therefore, this writ-

---

**6.** This writer is aware that the Preamble to Part G, drafted in 1983, stated, "The provisions of this part generally do not apply to fishing vessels, whaling vessels, or yachts." U.S.Code, Title 46, Part G, Historical and Revision Notes (Aug. 26, 1983). Defendants

er is confident that § 11107's "seaman" language cannot be held to exclude lay-share fishermen, and agrees. with the Ninth Circuit that § 11107 is available for these fishermen "as a statutory default to prevailing market wage in the case of an invalid contract." *Harper*, 278 F.3d at 977.[7]

Defendants disagree with this thesis, arguing that § 11107 does not, and was never intended to apply to lay-share fishermen, but rather only to merchant seamen. To support this argument, Defendants delve deeply into the legislative history of United States admiralty law, which historically treated fishermen and merchant seamen differently. Defendants argue that this historical difference, combined with a review of the legislative history of § 11107 and its predecessors, suggests a contrary reading of this statute, and prevents its application to lay-share fishermen. When, as here, a statute is clear on its face, legislative history "cannot serve as a baseline for statutory construction." *Lopez–Soto v. Hawayek*, 175 F.3d 170, 176 (1st Cir.1999). As the United States Supreme Court has held, "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod-uct Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). However, because Defendants argue that the legislative history expresses an intended contrary result, this writer will examine it.

Prior to Congress' recodification of the various admiralty statutes in the 1980s, the language now contained in § 11107 was located in § 578, and its statutory wage penalty applied to merchant seamen, but not fishermen working for lay-shares. *See* 46 U.S.C § 578 (rep.Aug.26, 1983); 46 U.S.C. § 544 (rep.Aug.26, 1983). When the statutes were recodified and reorganized, Congress repealed the old statutes, including § 578. *See id.*

Defendants contend that Congress merely reorganized and recodified existing admiralty laws in the 1980s, and that any material change that may have taken place at this time in the statutes should be viewed by this Court as unintentional, and contrary to the intent of Congress. As evidence of this legislative intent, Defendants refer this writer to certain sections of the legislative history explaining the need to reorganize and group together the admiralty laws that were then spread throughout the United States Code, and presenting a general intent of Congress not to change the law, but merely to modernize it and recodify it as a unit. *See*

---

argue that the Court should infer from this sentence that Congress intended to generally exclude fishing vessels from all the statutes within Part G that do not refer to them specifically, including § 11107. However, five years after this preamble was published, Congress broadened the scope of Part G by passing the Commercial Fishing Industry Vessel Safety Act of 1988, which enacted §§ 10601 and 10602. By inserting these fishing agreement provisions in Part G, and by using the term "seaman" to describe a lay-share fisherman in § 10601 and § 10602, Congress clearly brought fishermen within the scope of that term as it is used throughout Part G, including § 11107, and afforded them all resultant rights and privileges, unless a specific statute excludes them by its terms. "Congress is presumed to be knowledgeable about existing law pertinent to any new legislation it enacts." *Native Village of Venetie I.R.A. Council v. State of Alaska*, 944 F.2d 548, 554 (9th Cir.1991).

7. This Court also agrees with the Ninth Circuit that the statutory wage contemplated by § 11107 is the highest rate of wages for a similarly ranked seaman departing the same port at the time of the wrongful engagement. *See TCW Special Credits*, 129 F.3d at 1333; *Harper*, 278 F.3d at 977.

H.R.Rep. No. 338, 98th Cong. 1st Sess. 1983, U.S.Code Cong. & Admin.News 1983, pp. 924, 928–31, *available at* 1983 WL 25324, p. 116–19.

However, this sentiment, as reported by Defendants, conveys only a piece of the Congressional intent behind the 1983 maritime recodification. In later pages of the same House Committee Report from the Committee on Merchant Marine and Fisheries cited by Defendants, this writer finds the following:

The Committee wants to make it clear, however, that the bill as reported does in fact make a great many changes to the present law.... Thus, if a comparison of the language of this bill with the existing law shows that a substantive change has resulted, it should be understood that that change was intended by the Committee. The Committee intends and hopes that the interpretation of the maritime safety laws as codified and enacted by this bill will be based on the language of the bill itself. The bill, as reported, is based on that premise. There should, therefore, be little or no occasion to refer to the statutes being repealed in order to interpret the provisions of this bill.

The Committee also feels, as the courts have held, that the literal language of the statute should control the disposition of the cases. There is no mandate in logic or in case law for reliance on legislative history to reach a result contrary to the plain meaning of the statute, particularly where that plain meaning is in no way unreasonable.

H.R.Rep. No. 338, 98th Cong. 1st Sess. 1983, U.S.Code Cong. & Admin.News 1983, p. 932, *available at* 1983 WL 25324, p. 120.

In light of these statements of legislative intent, it is clear that Defendants' argument must fail. Defendants ask this court not to look at the plain statutory language of § 11107 as written, but to divine dispositive legislative intent based on repealed statutes. This Court declines to assume a legislative intention contrary to the plain language of the statute, and will interpret the language of § 11107 as the legislature codified it.

Finally, Defendants argue that applying § 11107 to lay-share fishermen will create an absurd result, because it would allow a rookie seaman to potentially recover the same wages as a veteran seaman for unequal performance. However, Defendants overlook the fact that § 11107 has been viewed both as a "penalty" placed on vessel owners for lack of compliance with admiralty laws and as a "statutory default to market wage" when a contract is contrary to law, and therefore invalid. *Harper*, 278 F.3d at 977. Defendants remain free to pay seaman different wages based on their level of experience, however, such an agreement must be reduced to writing and signed by all appropriate parties before leaving port, consistent with § 10601. If Plaintiffs receive higher wages for their work then Defendants originally intended, then that is the penalty Defendants have to pay for failing to comply with the law and utilize a term-specific, written contract. However, this Court agrees with the Ninth Circuit that § 11107's default wage "must be computed with respect to the seaman's actual rate," taking into account his position and ranking on the ship, and not impose "the highest possible rate on the ship." *See id.* (holding that § 11107 did not afford crew with a statutory right to captain's wages).

Thus, in light of the foregoing, the Court concludes that § 11107 applies to lay-share fishermen, and may be utilized by Plaintiffs as a statutory default wage in place of their void contracts with Defendants. Therefore, plaintiffs' motion for summary judgment on the application of § 10601

and § 11107 to lay-share fishermen is granted. The Court now turns to Defendants' motion for summary judgment on its defenses of laches and waiver.

## V. Defenses

Defendants also cross-move for summary judgment in their favor, raising the defenses of waiver and laches. These will each be discussed in turn.

## A. Waiver

■ Defendants argue that by accepting payment for their services at each trip's conclusion, Plaintiffs have waived the right to later contest the amount they were paid. Waiver is the "intentional or voluntary relinquishment of a known right[.]" Black's Law Dictionary 1580 (6th ed.1990); *Irons v. Federal Bureau of Investigation*, 880 F.2d 1446, 1452 (1st Cir. 1989); *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir.1985). A person cannot be said to waive a right unless he or she does it knowingly, that is, with knowledge of the facts. *See id.* Thus, to successfully attain summary judgment on this issue, Defendants must present undisputed facts establishing that Plaintiffs knew that they were entitled to recover additional funds at the end of each trip, but, despite this knowledge, accepted the Defendants' checks as payment. Whether Plaintiffs knew that they were entitled to additional funds at the time they accepted Defendants' checks remains an unresolved issue of fact. Plaintiffs claim that they were not aware that they were each paid different lay-shares for the same work, or that the various agreements Defendants executed with Plaintiffs were in violation of § 10601, until sometime in the year 2000. Defendants, however, claim that Plaintiffs were always aware that they were compensated on a lay-share system, and charge them with knowledge of the appropriate statutory provisions. What Plaintiffs knew and when they knew it remain genuine issues of material fact requiring a credibility determination from the trier of fact, and, as a result, cannot be resolved on summary judgment. Therefore, Defendant's motion for summary judgment on this ground must be denied.

## B. Laches

In addition, Defendants argue that the doctrine of laches bars Plaintiffs' claim for relief. "[L]aches is an equitable defense barring a claim for relief, prior to the running of the limitations period, 'where a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party.'" *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 217 F.Supp.2d 206, 228–29 (D.R.I.2002) (quoting *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir.1989)). In admiralty cases, when Congress has provided no specific statute of limitations governing the timeliness of a claim, "maritime law and the equitable doctrine of laches govern the time to sue." *TAG/ICIB Services v. Pan American Grain Co., Inc.*, 215 F.3d 172, 175 (1st Cir.2000). As the First Circuit has observed, the application of laches is within the "'sound discretion' of the district court." *Puerto Rican–American Ins. Co. v. Benjamin Shipping Co.*, 829 F.2d 281, 283 (1st Cir.1987).

■ When conducting a laches analysis in an admiralty case, the Court must determine the most analogous statutory limitations period by looking to other federal statutes or, where applicable, state law. *Guerrido v. Alcoa Steamship Co.*, 234 F.2d 349, 358 (1st Cir.1956). This analogous statute is not dispositive of the claim, rather, it determines which party bears the burden of proof on the issue. *Puerto Rican–American*, 829 F.2d at 283. If a plaintiff files a complaint within the analogous statutory period, then the defen-

150

dant carries the burden of proving that plaintiff's delay in filing suit was unreasonable and that defendant suffered prejudice due to this delay. *Id.* However, if the plaintiff files after the analogous statutory period has passed, then the burden shifts to the plaintiff, and a presumption of laches is created in favor of the defendant. *Id.*

■ Here, Defendants have suggested that the six month statute of limitations found in 46 U.S.C. § 10602 is the most analogous statute of limitations. This statute governs the time to sue for fishermen bringing claims for wages or shares based on written contracts meeting the requirements for written fishing agreements outlined by Congress in § 10601. However, the Ninth Circuit has held this statute of limitations inapplicable to actions brought by fishermen alleging that their fishing agreements violate § 10601, and thus, are void as contrary to the laws of the United States. *Seattle–First Nat. Bank,* 98 F.3d at 1198 ("Congress would not have established a [six month] statute of limitations for breaches of agreements which it has deemed 'void.' "). This writer agrees with the Ninth Circuit that it is unlikely that Congress would have intended a six month statute of limitations for void contracts, and, as a result, declines to adopt six months as the most analogous statute of limitations.

■ Plaintiffs suggest that this Court look to Rhode Island state law for the most analogous statute of limitations, and argue that the Court should assign the burden of proof for laches based on the ten year statute of limitations found in R.I. Gen. Laws § 9–1–13(a), the state statute of limitations for all civil actions arising under state law, excluding torts, *see* R.I. Gen. Laws § 9–1–14, and other causes of action with specific individual limitations periods, such as professional malpractice. *See* R.I. Gen. Laws § 9–1–14.1. Recently, the Rhode Island Supreme Court held § 9–1–

13(a)'s "catchall ten-year statute of limitations" applicable to claims for unpaid statutory wages, reasoning that these claims "do not fall within any of the other specific statutory provisions providing for shorter periods of limitation" within Rhode Island law. *Pellegrino v. Rhode Island Ethics Commission,* 788 A.2d 1119, 1127 (R.I. 2002) (per curiam). Because Plaintiffs' claims do not arise from personal injuries, but, rather, are in the nature of a statutory wage claim, this Court agrees with Plaintiffs that Rhode Island's ten year statute of limitations, § 9–1–13(a), is the most analogous statute of limitations for determining the burden of proof in this laches analysis. As a result, Plaintiffs' complaint, filed on August 31, 2001, is within the ten year statutory period, and Defendants bear the burden of showing that Plaintiffs' claim is barred by laches.

■ With the burden of proof established, this writer turns to the laches analysis. For Plaintiffs' claim to be barred by laches, Defendants must show that Plaintiffs delayed unreasonably in bringing suit, and that this delay prejudiced Defendants. However, as was true for Defendants' defense of waiver, genuine issues of material fact remain as to when Plaintiffs became aware that Defendants contracted with them in violation of § 10601. What Plaintiffs knew, when they knew it, and, consequently, whether there was a delay in bringing suit, all remain disputed issues of fact between the parties.

Defendants also bear the burden of showing that Plaintiffs' delay in bringing suit caused them prejudice. In their motion for summary judgment, Defendants argue that they are prejudiced by Plaintiffs bringing suit years after their respective trips on the *Relentless* and *Persistence* because Defendants immediately divided the crew's "share" of the proceeds from each trip as soon as the trip was over, and,

thus, Defendants never retained any portion of the crew's share to redistribute amongst disgruntled fishermen who challenge their wages after the fact. However, Defendants cannot establish prejudice resulting from Plaintiffs' delay in bringing suit by arguing that they do not have the money to pay Plaintiffs' claim. To successfully utilize the defense of laches, Defendants must show not only unreasonable delay, but that the delay prejudiced their ability to defend the suit. *See Gardner v. Panama Railroad Co.,* 342 U.S. 29, 31, 72 S.Ct. 12, 96 L.Ed. 31 (1951); *Cities Service Oil Company v. Puerto Rico Lighterage Co.,* 305 F.2d 170, 171 (1st Cir.1962); *Vega v. The Malula,* 291 F.2d 415, 418 (5th Cir.1961). As a result, the issue of laches is not appropriate for summary judgment, and Defendants' motion on this ground must also be denied.

*Conclusion*

For the aforementioned reasons, Plaintiffs' motion for summary judgment is considered as a motion for partial summary judgment, pursuant to Fed.R.Civ.P. 56(d), and is granted as to the application of 46 U.S.C. §§ 10601 and 11107. Defendant's cross-motion for summary judgment is denied on all the grounds asserted. Genuine issues of material fact remain as to the defenses of waiver and laches. Defendants will bear the burden of proof on those issues at trial, and Plaintiffs will have to prove what monetary relief they are entitled to if Defendants falter on these defenses.

It is so ordered.