*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CV-1813 & 12-CV-1910

DISTRICT OF COLUMBIA FIRE & EMERGENCY
MEDICAL SERVICES DEPARTMENT, APPELLANT,

V.

DISTRICT OF COLUMBIA PUBLIC EMPLOYEE
RELATIONS BOARD, APPELLEE,

AND

LOCAL 36, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS,
INTERVENOR-APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAP-7110-11)

(Hon. Peter A. Krauthamer, Trial Judge)

(Argued November 13, 2013　　　　　　　　Decided December 11, 2014)

*Todd S. Kim*, Solicitor General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellant.

*Geoffrey H. Simpson*, with whom *Bruce A. Fredrickson* and *Cedar P. Carlton* were on the brief, for appellee.

*Jeremiah A. Collins*, with whom *Devki K. Virk* and *Jacob Karabell* were on the brief, for intervenor-appellee.

Before WASHINGTON, *Chief Judge*, BECKWITH, *Associate Judge*, and NEBEKER, *Senior Judge*.

BECKWITH, *Associate Judge*: This case involves a dispute between the District of Columbia Fire and Emergency Medical Services Department (FEMS) and the intervenor here, Local 36, International Association of Fire Fighters (Local 36), over the question whether Congress intended to permanently or only temporarily restrict local firefighters' bargained-for overtime pay in a law passed in response to a fiscal crisis in the late 1990s. FEMS appeals from a Superior Court order affirming a decision by the District of Columbia Public Employees Relations Board (PERB), which in turn sustained an arbitration award granted in favor of Local 36. Taking note of the presumption against permanence that typically applies to provisions in appropriations bills, the Superior Court ruled that § 156 of the 2001 District of Columbia Appropriations Act was a temporary measure that expired at the end of the 2001 fiscal year. Pub. L. No. 106-522, 114 Stat. 2440, 2477 (2000). For the reasons explained below, we affirm the judgment of the Superior Court.

## I.

The roots of this dispute are found in a piece of legislation Congress passed nearly twenty years ago called the District of Columbia Financial Responsibility and Management Assistance Act of 1995 (FRMAA). Pub. L. No. 104-8, 109 Stat. 97 (1995) (codified as D.C. Code §§ 47-391.01 to -395 (2012 Repl.)).

Determining that "[a] combination of accumulated operating deficits, cash shortages, management inefficiencies, and deficit spending in the current fiscal year [had] created a fiscal emergency in the District of Columbia," 109 Stat. 97 at § 2 (a)(1), Congress created a board—the Financial Responsibility and Management Assistance Authority (Control Board)—to assist the District's government in "restructuring its organization and workforce," "modernizing its budget," and ensuring long-term economic vitality by reviewing the financial impact of important government activities prior to their implementation. *Id*. at § 2 (b)(4)-(8).

In the Omnibus Consolidated Appropriations Act of 1997, Congress expanded the Control Board's authority, granting it the power to issue orders, rules, and regulations "as it consider[ed] appropriate to carry out [its] purposes." Pub. L. No. 104-208, 110 Stat. 3009 § 5203 (f) (1996) (codified as D.C. Code § 47-392.7 (2012 Repl.)). Pursuant to that authority, the Control Board issued an order on December 27, 1996, overriding provisions in collective bargaining agreements (CBAs) that required the District to compensate public employees more generously than required by the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq*. While District firefighters had previously negotiated time-and-a-half wages for any hours worked exceeding an average of forty-two hours per week over a four-week period, the FLSA requires only that firefighters be

compensated at a time-and-a-half rate for hours worked exceeding an average of fifty-three hours per week over a four-week span. 29 U.S.C. § 207 (k); *see also* 29 C.F.R. § 553.230.

Within a few months of the Control Board's order, individuals and unions affiliated with the American Federation of Government Employees (AFGE) filed a lawsuit in United States District Court to challenge the Control Board's authority to abrogate previously agreed-upon collective bargaining agreements. *American Fed'n of Gov't Emps. v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.,* No. 97-807, Complaint and Amended Complaint (D.D.C. filed Apr. 22 and May 5, 1997). While that case was pending, the United States Court of Appeals for the District of Columbia Circuit issued an opinion in a case in which a local university's faculty union challenged a different Control Board order on similar grounds. In *University of District of Columbia Faculty Ass'n v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, the D.C. Circuit held that Congress had not intended to delegate to the Control Board authority to abrogate existing CBAs. 163 F.3d 616, 618 (D.C. Cir. 1998). Relying on that opinion, the district court granted AFGE's motion for summary judgment and enjoined implementation of the order in question.

Shortly thereafter, Congress passed the 2001 District of Columbia

Appropriations Act, in which Congress made clear that the D.C. Circuit had misunderstood the intent behind the Omnibus Consolidated Appropriations Act of 1997. Pub. L. No. 106-522, 114 Stat. 2440, 2477 (2000). Section 156 (a) of the 2001 Act replicated the Control Board's order (making only immaterial changes), and § 156 (b) provided that "[s]ubsection (a) of this section shall be effective December 27, 1996" and that "[t]he Resolution and Order of the [Control Board], dated December 27, 1996, is hereby ratified and approved and shall be given full force and effect." *Id.* In light of Congress's clear statement, the district court reversed course and issued a new opinion, ruling that "[i]t is apparent that Congress intended to bind all employees of the District to the rules regarding compensation for overtime work found in the [FLSA]." *American Fed'n of Gov't Emps. v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 133 F. Supp. 2d 75, 78-79 (D.D.C. 2001).

The Control Board, concluding that it had fulfilled all of its duties and responsibilities as specified in the FRMAA, suspended its activities on September 30, 2001. While most of the Control Board's actions were temporary measures taken in response to a temporary fiscal crisis, the Board had the authority to take actions that would continue even after it suspended its activities, and it did enact many permanent laws during its brief life. The central question of this case is whether Congress intended § 156—the section ratifying and "giv[ing] full force

and effect" to the Control Board's 1996 Order that prohibited overtime compensation exceeding the FLSA minimum—to lapse at the end of fiscal year 2001, or whether it intended that provision to remain as permanent law for the District of Columbia.

FEMS, believing that § 156 enacted permanent law, eschewed the more generous overtime arrangement negotiated between the District and several of its largest bargaining units in favor of § 156's lower rate. On October 12, 2007, Local 36—the union representing approximately 1,700 District firefighters and emergency medical responders—filed a grievance against FEMS through the office of the fire department chief. The union sought prospective and retroactive compliance with the obligations of the collective bargaining agreement, beginning after the alleged lapse of § 156 at the end of fiscal year 2001. The union claimed to have recently discovered a 2004 arbitration award sustaining a grievance granted in favor of the Fraternal Order of Police against the Metropolitan Police Department. The arbitrator in that case determined that § 156 had indeed lapsed and that the officers were entitled to recover all overtime due under the reactivated collective bargaining agreement, beginning at the end of fiscal year 2001. That arbitration award was, in turn, upheld by PERB in March of 2005. *Metropolitan Police Dep't & Fraternal Order of Police/Metropolitan Police Dep't Labor Comm.*, PERB Case No. 04-A-13, Opinion No. 784 (March 31, 2005), 52 D.C.

Reg. 5181.

In this case, however, Fire Chief Dennis Rubin denied Local 36's grievance on November 13, 2007, and the union sought arbitration the next day. The arbitrator, Andree McKissick, disagreed with the fire chief, sustaining the union's grievance and finding that the "evidence presented reveals that it was the Congressional intent for § 156 to be of a one (1) year duration because of the absence of words to express future effectuation of this Act." In the arbitrator's view, then, "it would logically follow that at the expiration of this Act that Article 18 [of the CBA], the overtime provision, would be reactivated and viable." Arbitrator McKissick ordered "immediate disbursements for overtime work" with "no limitations on back pay."

FEMS sought review of the arbitration award before PERB, which was authorized under the Comprehensive Merit Personnel Act (CMPA) to review a public sector arbitration award to determine whether "the award [was] on its face contrary to law and public policy." D.C. Code § 1-605.02 (6) (2012 Repl.).[1] In an order issued on August 5, 2011, the Board concluded that "[b]ecause Section 156

---

[1] The board's review powers are limited by the CMPA, which provides PERB with the authority to overturn an arbitration award "only if [1] the arbitrator was without, or exceeded, his or her jurisdiction; [2] the award on its face is contrary to law and public policy; or [3] was procured by fraud, collusion, or other similar and unlawful means." D.C. Code § 1-605.02 (6).

is susceptible to a different interpretation than the one urged by FEMS, the Award is not, on its face, contrary to that statute." *District of Columbia Fire & Emergency Servs. Dep't & Int'l Ass'n of Firefighters, Local 36*, PERB Case No. 09-A-07, Opinion No. 1034 (Aug. 5, 2011).

Superior Court Judge Peter A. Krauthamer affirmed the PERB decision in an opinion dated November 9, 2012. Reviewing de novo PERB's statutory interpretation of § 156, Judge Krauthamer applied the presumption that "provisions within an appropriations act are effective only for the fiscal year covered"—a presumption that "can be overcome only if a provision uses language indicating futurity or if there is clear congressional intent to the contrary." Concluding that § 156 lacked words of futurity, while many other provisions of the same 2001 Appropriations Act contained them, Judge Krauthamer determined that Congress had intended § 156 to lapse at the end of fiscal year 2001.

FEMS filed a timely appeal, presenting this court with the question whether PERB erred in concluding that the arbitration award was not "on its face . . . contrary to law and public policy."

**II.**

"Although this is an appeal from a review of agency action by the Superior Court rather than a direct appeal to this court, we review the PERB decision as if

the matter had been heard initially in this court." *Doctors Council of the District of Columbia Gen. Hosp. v. District of Columbia Pub. Emp. Relations Bd.*, 914 A.2d 682, 695 (D.C. 2007) (citing *Gibson v. District of Columbia Pub. Emp. Relations Bd.*, 785 A.2d 1238, 1241 (D.C. 2001)).  We generally afford PERB decisions a high degree of deference, yielding to PERB's interpretation of the CMPA unless it is "unreasonable in light of the prevailing law or inconsistent with the statute" or "plainly erroneous."  *Fraternal Order of Police/Dep't of Corr. Labor Comm. v. District of Columbia Pub. Emp. Relations Bd.*, 973 A.2d 174, 176 (D.C. 2009). This court does not, however, defer to an agency's interpretation of law that the agency has not been delegated the authority to administer, and so will not defer to PERB in interpreting statutes other than the CMPA.  *See Office of the People's Counsel v. Public Serv. Comm'n of the District of Columbia*, 955 A.2d 169, 173 (D.C. 2008) (citing *Johnson v. SEC*, 87 F.3d 484, 486 (D.C. Cir. 1996))*; see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.") (citations omitted).

While the parties agree on the above principles, they ardently contest the

level of deference that PERB's decision warrants in this case. FEMS argues that "[t]he key point of dispute before the arbitrator was a purely legal question of statutory interpretation: whether Congress intended Section 156 in the District's appropriations act for Fiscal Year 2001 . . . to be permanent or lapse after that year." According to FEMS, PERB's decision deserves no deference here because the agency has neither the authority to interpret nor any special expertise in dealing with appropriations acts. Having framed the matter as a review of "PERB's statutory interpretation of Section 156 of the Fiscal Year 2001 D.C. Appropriations Act" and having reviewed that interpretation de novo, the trial court appears to have adopted the government's position on the issue of deference.

For its part, PERB points to case law suggesting that "under the CMPA where the resolution of the issue requires an arbitrator to apply an external law, the Court does not employ 'the normal tools of statutory construction to decide . . . what the rule-making body intended.'" Rather, PERB cites this court's opinion in *District of Columbia Metro. Police Dep't v. District of Columbia Pub. Emp. Relations Bd.*, 901 A.2d 784 (D.C. 2006) (*MPD*), for the proposition that courts should defer to an arbitrator's interpretation of external law that has become incorporated into a collective bargaining agreement:

> When construction of the contract implicitly or directly requires an application of "external law," *i.e.*, statutory or

> decisional law . . . , the parties have necessarily bargained for the arbitrator's interpretation of the law and are bound by it. Since the arbitrator is the "contract reader," his interpretation of the law becomes part of the contract and thereby part of the private law governing the relationship between the parties to the contract.

*Id.* at 789 (quoting *American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 6 (D. C. Cir. 1986)).

In this case, the parties' collective bargaining agreement seemed to require the arbitrator to interpret an external law—here, § 156 of the D.C. Appropriations Act—in order to decide whether FEMS had breached Article 18, the CBA's overtime provision. That is because Article 18 utilized the phrase "as permitted by law" to qualify the overtime provision in question. By seeking the arbitrator's opinion on the validity of Article 18, then, the parties to arbitration were essentially asking the arbitrator whether § 156 was temporary or permanent law. In that respect, the arbitrator's view of the law seems to have been exactly what the parties bargained for here, and courts have recognized that "[a]llowing undue challenges to arbitration awards would defeat the finality and speedy dispute resolution expected of the arbitration procedure." *Revere Copper & Brass Inc. v. Overseas Private Inv. Corp.*, 628 F.2d 81, 83 n.1 (D.C. Cir. 1980). At the same time, this court appreciates the dangers inherent in such an expansive view of the arbitration process. After all, PERB would not otherwise enjoy deference in interpreting

§ 156—a statute that PERB does not administer—and FEMS's contention that parties "may not skirt a legal prohibition by contracting for an arbitration award and then asking a court to defer to a resulting illegal award" is well-taken.

Whether the logic of *MPD* applies to this case is not altogether clear. As FEMS points out, *MPD* arguably involved an agency's interpretation of a collective bargaining agreement that in turn implicated external law, rather than an agency's interpretation of external law itself. *See MPD*, 901 A.2d at 785-89. The distinction remains murky, however, and the extent to which the parties to a CBA that contains an arbitration provision have bargained for an arbitrator's interpretation of the external law "incorporated" into the CBA is an important and arguably unresolved question of District administrative law. But it is a question that the court need not resolve today, because we conclude that PERB and the Superior Court advanced the most natural reading of § 156 and that even applying a de novo standard of review we would affirm their interpretation of the statute.

**III.**

In interpreting an act of Congress, "[w]e start, as we must, with the language of the statute." *Tippett v. Daly*, 10 A.3d 1123, 1126 (D.C. 2010) (quoting *Bailey v. United States*, 516 U.S. 137, 144 (1995)). And in examining that statutory language, "it is axiomatic that '[t]he words of the statute should be construed

according to their ordinary sense and with the meaning commonly attributed to them.'" *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (quoting *Davis v. United States*, 397 A.2d 951, 956 (D.C. 1979)).

At the outset, it is well settled that provisions contained in appropriations bills are presumed to expire at the end of the fiscal year. This presumption was first announced by the Supreme Court more than 170 years ago.

> It would be somewhat unusual, to find engrafted upon an act making special and temporary appropriations, any provision which was to have a general and permanent application to all future appropriations. Nor ought such an intention on the part of the legislature to be presumed, unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation.

*Minis v. United States*, 40 U.S. 423, 445 (1841); *see also United States v. Vulte*, 233 U.S. 509 (1914) (following *Minis*); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978).

The United States Court of Appeals for the First Circuit recently affirmed and expounded upon this principle: "The rule, then, is that Congress may create permanent, substantive law through an appropriations bill only if it is clear about its intentions. Put another way, Congress cannot rebut the presumption against

permanence by sounding an uncertain trumpet." *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 224 (1st Cir. 2003); *see also Building & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 274 (D.C. Cir. 1992) ("[A] provision contained in an appropriations bill operates only in the applicable fiscal year, unless its language clearly indicates that it is intended to be permanent"); *United States v. International Bus. Machs. Corp.*, 892 F.2d 1006, 1009 (Fed. Cir. 1989) ("Had Congress intended to make the exemption permanent, it knew how: it could and we believe would have used words of futurity"); *NLRB v. Thompson Prods., Inc.*, 141 F.2d 794, 798-99 (9th Cir. 1944) ("Although a substantive amendment . . . may be incorporated in an appropriation act . . . unless a contrary purpose is clearly evident the limited period to which the provision applies suggests that no substantive change was intended") (internal citations omitted). "[T]he crucial factor" in evaluating whether Congress intended an appropriations provision to remain in effect beyond the fiscal year is "the presence or absence of words of futurity." *Building & Const. Trades Dep't*, 961 F.2d at 274 (quoting United States Government Accountability Office, Principles of Federal Appropriations Law 2-37 (1982) (1 GAO Principles)).

It is against this backdrop that we turn to the plain language of § 156. The section reads in pertinent part:

(a) Notwithstanding the provisions of the District of Columbia Government Comprehensive Merit Personnel Act of 1978 (D.C. Law 2-139; D.C. Code 1-601.1 *et seq.*), or any other District of Columbia law, statute, regulation, the provisions of the District of Columbia Personnel Manual, or the provisions of any collective bargaining agreement, employees of the District of Columbia government will only receive compensation for overtime work in excess of 40 hours per week (or other applicable tour of duty)[2] of work actually performed, in accordance with the provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.

(b) Subsection (a) of this section shall be effective December 27, 1996. The Resolution and Order of the District of Columbia Financial Responsibility and Management Assistance Authority, dated December 27, 1996, is hereby ratified and approved and shall be given full force and effect.

§ 156, 114 Stat. 2440 (2000). The heart of FEMS's argument is that "the only reasonable way to read the plain text" of § 156 is as a reflection of Congress's intent to enact permanent law. Notwithstanding FEMS's contention that there is only one reasonable way to read the plain text, several interpretations of § 156 seem plausible. Indeed, perhaps the only clear message that emerges from the

---

[2] As discussed, the FLSA requires that firefighters be compensated at a time-and-a-half rate for hours worked exceeding an average of fifty-three hours per week over a four-week period. 29 U.S.C. § 207 (k); *see also* 29 C.F.R. § 553.230. Because this represents a deviation from the general FLSA rule requiring overtime pay for work done in excess of forty hours per week, firefighters fall into the "other applicable tour of duty" category in the statute quoted above.

record is that great uncertainty has surrounded the question of § 156's permanence. The provision has been understood differently at different times and by different people, and the parties devote large portions of their briefs to gesturing at scattered statements that support their respective positions.

For one, the D.C. Council appears to have wavered on its understanding of § 156: Local 36 points to 2004 committee testimony from Michael Jacobs, the supervisory labor relations specialist at the D.C. Office of Labor Relations and Collective Bargaining, in which he explained: "there was a debate back and forth about whether or not the provision in 2001 [§ 156] continued beyond that time period," and Mr. Jacobs's testimony sought "really to *clarify* that the government retains the authority . . . to negotiate all aspects of compensation, including overtime." Committee of the Whole, D.C. Council, Hearing on Bill 15-768 (Apr. 19, 2004). As PERB notes in its brief and Arbitrator McKissick explicitly found in this case, the District's two largest bargaining units negotiated an agreement in 2003 that would have violated § 156 if the section had remained in force. That the District signed that collective bargaining agreement suggests that the District viewed § 156 as having lapsed.

On the other hand, FEMS points to other actions of the D.C. Council to suggest that § 156 was understood to be permanent. FEMS notes that in July of

2001, the Council issued a resolution stating its view that § 156 was unjust and calling on Congress to repeal it, D.C. Resolution 14-156, 48 D.C. Reg. 6394, 6395 (July 20, 2001)—a puzzling action if the law was expected to lapse less than three months later. FEMS also looks to a Council resolution from a few months after the supposed lapse that appears to acknowledge § 156's continuing effect. *See* D.C. Resolution 14-434, 49 D.C. Reg. 4747 (May 24, 2002). That resolution approved a collective bargaining agreement but stated that the Control Board's order, and its subsequent ratification by Congress, rendered the agreement's overtime provision "inoperative."

Nor was the confusion over § 156's permanence confined to the D.C. Council. While PERB supports its reading that the section was temporary with a 2003 letter from Congressman Chaka Fattah, the ranking member of the House Subcommittee on D.C. Appropriations, in which he opined that the provision had expired after one year, FEMS points out that by Local 36's own admission, the union had assumed that § 156 remained in effect until six years after its supposed lapse, when the union stumbled upon an arbitration award that suggested otherwise. While subsequent understandings and statements concerning the statute are not determinative of Congress's intent in passing it, this impressive amount of confusion reinforces the view that a plain meaning was elusive.

Though FEMS's textual analysis stands as a plausible reading of the statute, it does not change this conclusion. FEMS makes five arguments that merit discussion.

First, while FEMS acknowledges the general rule that provisions in appropriations bills are presumed temporary, it argues that the presumption does not apply here because § 156 "did not mention or directly deal with appropriations." In support, FEMS looks to the GAO Principles for the proposition that "the degree of relationship between a given provision and the object of the appropriation act in which it appears . . . is a factor to be considered. If the provision bears no direct relationship to the appropriation act in which it appears, this is an indication of permanence." 1 GAO Principles 2-38. It is true that § 156 merely changes the requirements for overtime pay and is not technically an "appropriation." A provision need not itself be an appropriation, however, to have a "direct relationship to the appropriation act in which it appears." And here, to suggest that § 156 has a less than direct relationship to appropriations is to overlook the context from which it came. Like the vast majority of measures that originated in the Control Board, § 156 was designed to save the District money and conserve public resources during a fiscal crisis—goals very closely related to appropriations. While the presumption against permanence probably would not apply to a provision in an appropriations bill that was truly distinct from

appropriations—and Congress does sometimes legislate for the District this way, *see, e.g.*, D.C. Appropriations Act of 1993, Pub. L. No. 102-382, § 138, 106 Stat. 1422, 1436-43 (1992) (requiring the electorate to vote on an initiative regarding the penalty for first-degree murder)—in our view, it applies to § 156.

Second, arguing that "the only reasonable way to read § 156 is to read it as permanent law," FEMS emphasizes that the term "ratif[y]" in subsection (b) is itself a term of art that connotes futurity and permanence. FEMS points to Black's Law Dictionary, which defines "ratification" as "confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done." Black's Law Dictionary 1289 (8th ed. 2004); *see also Swayne & Hoyt Ltd. v. United States*, 300 U.S. 297, 302 (1937) ("It is well settled that Congress may, by enactment not otherwise inappropriate, ratify . . . acts which it might have authorized, and give the force of law to official action unauthorized when taken.") (internal citation and quotation marks omitted).

But congressional ratification of a Control Board order would enact permanent law only if the Control Board had intended the underlying order to be permanent. Both the language and the context of the order suggest that the Control Board did not have that intention. Most importantly, the text of the order itself strongly indicates that the Board viewed the abrogation of the collective bargaining

agreement as nothing more than a temporary necessity. At the outset that order cited § 141 of the 1997 District of Columbia Appropriations Act, Pub. L. No. 104-194, the provision instructing the Control Board to help ensure that the District remain under the congressional spending cap for the 1997 fiscal year. After explaining that the District was projected to exceed the cap by over $85 million, the order noted that "some employees of the District of Columbia government have received overtime pay for less than 40 hours a week of work actually performed, contributing to the *current operating deficit*," (emphasis added) and then went on to propose some changes—including the restriction on overtime that ultimately became § 156—"to assure that the District of Columbia government [meet] the requirement of Section 141 of the [1997 Appropriations] Act." The record does not indicate that the Control Board viewed overtime payments in excess of the minimum required by the FLSA as inherently suspect or reckless fiscal policy that should be forever barred in the District of Columbia. As Local 36 points out, such payments can be found in 98 percent of all collective bargaining agreements. *See* Michael R. Carrell & Christina Heavrin, Labor Relations and Collective Bargaining: Private and Public Sectors 254 (10th ed. 2013). To the contrary, the order appears to have effected a temporary spending cut to ameliorate the District's fiscal emergency existing at the time.

Reading the Control Board's order as temporary comports with the historical

events occurring in the late 1990s. While FEMS points out that the legislation establishing the Control Board had as its stated purpose to "ensure the [District's] *long-term* financial, fiscal, and economic vitality," the fact remains that the Control Board was a temporary response to a temporary problem. According to the FRMAA, the District was in "a fiscal emergency." Pub L. No. 104-8, § 2 (a)(1), 109 Stat. 98. The Control Board was created to help balance the budget, and it went about scouring the District government for ways to make up the District's considerable funding deficiency. The Control Board's order that required firefighters to work at least an average of fifty-three hours per week before collecting overtime pay was one part of a multipronged effort to reduce a gaping deficit. It was not an attempt to alter permanently the way in which the District compensates its firefighters. The Control Board's "Allocation of FY 97 Cost Savings Actions and Reductions" also lends support to the view that the order was a temporary measure taken in the midst of a temporary crisis. That document estimated that the reduction in overtime payments would save the District $5.4 million in 1997—a meaningful dent in the $85 million deficit the District was seeking to eliminate for that fiscal year.

FEMS cites several provisions in appropriations acts where Congress "ratified" certain actions, thereby making them effective beyond the immediate fiscal year. Unlike the provision at issue here, however, these appear to contain

words of futurity beyond the mere "ratification" of the underlying order. *See, e.g.*, Supplemental Appropriations Act, 1985, Pub. L. No. 99-88, § 134, 99 Stat. 293, 363 (Aug. 15, 1985) (ratifying a Public Service Commission order approving the deregulation of street lighting service and declaring that the order "shall continue to be in effect until revoked or rescinded"); *Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 505 (D.C. Cir. 1999) (discussing § 8003 of the Fiscal Year 1998 Supplemental Appropriations and Rescissions Act, Pub. L. No. 105-174, 112 Stat. 58, in which Congress specified the period—"between September 14, 1995[,] and March 31, 1998"—during which it intended that a fee collected by a private entity be "hereby legalized and ratified"). Without a clear showing either that the Control Board's original order was meant to be permanent or that Congress intended to transform a temporary order into permanent law—something even FEMS does not contend—§ 156 is best read as a temporary measure intended to last one fiscal year.

Third, FEMS argues that the presumption against permanence is overcome here because Congress expressly made § 156 apply to prior years. FEMS cites the GAO Principles for the proposition that "[s]ince an appropriation act is made for a particular fiscal year, the starting presumption is that everything contained in the act is effective *only for the fiscal year covered*." 1 GAO Principles 2-34. To be sure, it is unusual that Congress, in the 2001 District of Columbia Appropriations

Act, ratified a Control Board order from five years earlier and explicitly made it retroactively effective—by applying § 156 to the years 1997, 1998, 1999, and 2000—and thus could be seen as breaking the presumption that an appropriation act applies "only for the fiscal year covered." But applying the section backward in time does not perforce make the section apply forward in time as well. While Congress's statement that "this section shall be effective December 27, 1996" was a clear assertion of the section's retroactive application, there is no statement as to its prospective application, which stands at the heart of this case.

Fourth, FEMS attempts to explain away the lack of clear "words of futurity" by claiming that such words would be redundant given the nature of § 156. While FEMS acknowledges that many other sections of the appropriations act contain words clearly indicating permanence, such as "hereafter" or a reference to "subsequent fiscal years," FEMS claims that such words of futurity are natural only where Congress is establishing "annually repeating requirements" as opposed to simply amending the law. FEMS has compiled a list of provisions in the Appropriations Act of 2001 where Congress enacted permanent law without "expressly indicating that the amendment was effective in subsequent years." We do not doubt that, in some cases, Congress's intent to enact permanent law might be perfectly clear from the face of the provision, even absent a clear reference to successive fiscal years. For example, if a provision in an appropriations act were

to shut down a hospital, the hospital would not be resurrected the following year just because Congress failed to include a forward-looking phrase like "hereafter" or "and for all successive years." But this does not change the fact that the presumption against permanence applies where Congress's intent is unclear, and that Congress often uses clear words of futurity to dispel precisely the sort of ambiguity that has arisen in this case. Examples of such clear words of futurity abound in the District of Columbia Appropriations Act of 2001 itself. *See, e.g.*, § 153 (b), 114 Stat. 2475 (granting the Administrator of the EPA authority to enter into certain agreements concerning the federal government's property in the District of Columbia and clarifying that it "shall apply with respect to fiscal year 2001 *and each succeeding fiscal year*"); *id.* § 104 (a), 114 Stat. 2458 (requiring the Mayor to maintain an index of contacts and clarifying that it is "effective with respect to fiscal year 2001 *and each succeeding year*"); *id.* § 129 (b)(1), 114 Stat. 2467 (amending the reduction-in-force provision of the CMPA and clarifying that it is effective "*in each subsequent fiscal year*") (emphases added). These provisions do not appear to be different in kind from § 156, and in each of them, Congress took steps to rebut the presumption against permanence that applies in appropriations acts by using clear words of futurity. As PERB and the Superior Court concluded, the absence of such words in § 156 is significant. This reading of § 156 is further bolstered by § 105, which underscores the overall presumption

against permanence by confirming that "[n]o part of any appropriation contained in the Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein." § 105, 114 Stat. 2458.

Last, FEMS claims that treating § 156 as a temporary measure designed to lapse at the end of fiscal year 2001 would be "an absurd result Congress could not have intended." FEMS argues that a temporary ratification "would merely delay claims for unpaid overtime for ten months," until after the section's lapse. As Local 36 points out, however, § 156 is not about the payment of "claims" but about the right to earn overtime pay in accordance with a previously agreed-upon collective bargaining agreement. Section 156 did not purport to delay claims for ten months, then, but rather to prevent union members from receiving any overtime pay for work performed between December 27, 1996, and September 30, 2001, beyond what the FLSA requires. Restricting the payment of previously agreed-upon overtime for an approximately five-year period during which the District of Columbia was experiencing a fiscal emergency does not seem pointless, as FEMS contends.[3]

---

[3] *See, e.g.*, *Atlantic Fish Spotters*, 321 F.3d at 225 (concluding that it was not unreasonable to read an appropriation act's prohibition of the use of "spotter planes" by tuna fishermen as lasting for only one year because "[p]olitics is, after all, the art of compromise").

## IV.

For the foregoing reasons, we conclude that § 156—while not abundantly clear as to congressional intent—fails to overcome the well-settled presumption against permanence that attaches to provisions in appropriations bills. We agree with PERB and the Superior Court that § 156 is best read as a temporary provision that Congress intended to lapse at the end of fiscal year 2001.

*Affirmed.*